861 F.2d 363
 Harlan Alonzo SMITH, a/k/a Lonnie Smith, Plaintiff-Appellee,
v.
LIGHTNING BOLT PRODUCTIONS, INC., Jack B. Solerwitz, John C.
Maichin, Solerwitz & Leeds, Bank Leumi Trust Company of New
York, Madison Square Garden, Inc., Madison Square Boxing,
Inc. and Tiffany Promotions, Inc., Defendants,
Appeal of Jack B. SOLERWITZ, Solerwitz & Leeds and Lightning
Bolt Productions, Inc., Defendants.
 No. 1312, Docket 88-7008.
 United States Court of Appeals,
Second Circuit.
 Submitted June 20, 1988.
Decided Nov. 10, 1988.
Final briefs filed June 28, 1988.
 
 John W.E. Bowen, IV, New York City, for plaintiff-appellee.
 Jack B. Solerwitz, Mineola, N.Y. (Yaakov Kanovsky, Mineola, N.Y., of counsel), for defendants.
 Before NEWMAN, KEARSE and CARDAMONE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Jack B. Solerwitz, Lightning Bolt Productions, Inc. ("Lightning Bolt"), and the law firm of Solerwitz & Leeds ("S & L") appeal from a final judgment entered in the United States District Court for the Eastern District of New York, Jacob Mishler, Judge, following a jury trial and a remittitur, (1) ordering them to pay plaintiff Harlan Alonzo Smith, a/k/a Lonnie Smith, $158,446.14, plus interest, as compensatory damages for fraud, breach of fiduciary duty, and breach of contract, and (2) ordering Lightning Bolt and Solerwitz jointly to pay Smith $500,000, plus interest, as punitive damages for breach of fiduciary duty and fraud. On appeal, S & L contends that it was entitled to judgment on the ground that there was no evidence that S & L ever represented Smith; Solerwitz and Lightning Bolt contend that punitive damages were as a matter of law not awardable and were in any event not supported by the evidence; and all defendants contend that the entire verdict should have been set aside on the grounds, inter alia, that there was no evidence of fraud and that the jury's verdict was the product of a misunderstanding of the issues or of passion and prejudice. For the reasons below, we affirm the award of compensatory damages, and we vacate the award of punitive damages and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 The following facts do not appear to be seriously in dispute. Smith was a professional boxer who entered into a written agreement with Solerwitz in April 1985 which called for Solerwitz "to act as his attorney and legal adviser" in an effort to negotiate a championship bout for Smith. Solerwitz was a partner in S & L and was also, as Smith knew, a principal in Lightning Bolt, which was a licensed New York State boxing promotional corporation. Prior to April 1985, Smith had granted Top Rank, Inc. ("Top Rank"), one of the two leading boxing promoters, the exclusive right to promote his bouts. Following Smith's agreement with Solerwitz, Solerwitz obtained an assignment from Top Rank of its contract with Smith.
 
 
 3
 On May 27, 1985, Smith entered into a three-year contract with Lightning Bolt ("May 27 contract"), pursuant to which Lightning Bolt was given the exclusive right to promote boxing matches for Smith. This agreement, signed for Lightning Bolt by its president, John Maichin, provided, inter alia, that Smith would agree to fight either Aaron Pryor or Billy Costello for the Junior Welterweight Championship of the World Boxing Council ("WBC") or the International Boxing Federation; that Smith would receive $100,000 as compensation (his "purse") plus $50,000 in training expenses; and that if Smith won this bout, he would "receive an additional sum of $200,000.00 as and for a bonus from Lightning Bolt Productions, Inc." The May 27 contract also incorporated the terms of Smith's contract with Top Rank, including a provision that if Smith won a world championship, the promoter would arrange three additional bouts for him within the next year, paying him a purse of at least $150,000 for each title defense.
 
 
 4
 Pursuant to the May 27 contract, Lightning Bolt arranged for Smith to fight Costello, the WBC superlightweight champion, in Madison Square Garden on August 21, 1985. Lightning Bolt, however, lacked sufficient funds to pay for the arrangements, and Maichin advanced $400,000 of his own money for these expenses. In exchange, Maichin took a secured interest in the gate and ticket proceeds from the Garden. Smith soon became aware of Lightning Bolt's financial difficulties and sought reassurances as to the company's ability to pay him. Solerwitz told him not to worry.
 
 
 5
 On August 21, Smith defeated Costello and became the WBC superlightweight champion. Lightning Bolt promptly paid Smith $24,000 but stalled him with respect to the rest. Within the next few days, Smith pursued his request to be paid the remainder of the money called for by the May 27 contract, i.e., the remaining $76,000 of his purse plus his $200,000 bonus (the $50,000 in expenses apparently already having been paid). Lightning Bolt took the position that the $200,000 bonus was not due and gave him a check for $76,000. The check, however, was post-dated, and by the time Smith could deposit it in his bank, Lightning Bolt had stopped payment on it.
 
 
 6
 In September, having failed to gain payment of $276,000 of the sums specified in the May 27 contract, Smith took the position that Lightning Bolt had repudiated the contract. He commenced the present action in November 1985 against Solerwitz, Lightning Bolt, S & L, and Maichin, and against several other entities that were later dismissed. The complaint alleged principally that Lightning Bolt was liable to Smith for breach of the May 27 contract and for breach of its fiduciary duty as Smith's exclusive agent for fight promotion; that Solerwitz, Lightning Bolt, S & L, and Maichin were liable for fraud; and that Solerwitz and S & L were liable for legal malpractice and breach of their fiduciary duties as Smith's attorneys. Smith sought $329,000 in compensatory damages and several million dollars in punitive damages.
 
 
 7
 Lightning Bolt counterclaimed, asserting that Smith had breached the May 27 contract following the championship bout by refusing to allow Lightning Bolt to arrange further matches for him. After commencement of the suit, Lightning Bolt paid Smith an additional $117,553.86 pursuant to an order of the district court, bringing the total paid him to $141,553.86.
 
 A. The Jury's Verdict
 
 8
 Prior to trial, Maichin was granted a severance because of poor health. Smith's claims against the three remaining defendants and Lightning Bolt's counterclaim were tried and submitted to the jury.
 
 
 9
 The jury was asked to return a special verdict consisting of 20 questions, some with subparts. With respect to Smith's contract claim against Lightning Bolt, the jury found that the May 27 contract required that Smith be paid the $200,000 bonus at the time Smith won the championship (Question 1), that the amount due Smith under that contract after he won the championship was $350,000 (Question 3), that Lightning Bolt, not Smith, was the first to repudiate the contract (Questions 2(a), 4, and 5), that Lightning Bolt's failure to pay the postdated $76,000 check was a repudiation (Question 2(b)), and that by reason of Lightning Bolt's repudiation, Smith lost the sum of $608,446.14 (Question 6).
 
 
 10
 With respect to Smith's claims against Solerwitz and S & L, the jury found that Solerwitz had acted as Smith's attorney under their April 1985 agreement, but that he had done so negligently and in violation of the fiduciary duty he owed Smith (Questions 7, 8, and 10), and that these derelictions were attributable to S & L (Questions 9 and 11). It found that these acts proximately caused injury to Smith in the amount of $608,446.14 (Questions 12 and 13).
 
 
 11
 With respect to Smith's claims of fraud against Lightning Bolt, Solerwitz, and S & L, the jury found that prior to May 27, 1985, Solerwitz and/or Maichin had knowingly misrepresented Lightning Bolt's financial condition to Smith in order to induce him to enter into the May 27 contract (Questions 14(a) and (b)), and that Smith relied on these misrepresentations and suffered a loss of earnings as a result (Questions 14(c) and (d)). It found that the misrepresentations of Solerwitz were attributable to S & L (Question 14(e)).
 
 
 12
 The jury found that Solerwitz had "abuse[d] his position of trust as Smith's attorney by repeated fraudulent representations and in reckless and callous disregard of Smith's rights," that his conduct was attributable to S & L (Questions 15 and 17), and that "further acts of deception" by Solerwitz and/or Maichin "demonstrat[ed] a knowing, intentional, reckless and callous disregard of Smith's right to Lightning Bolt's loyalty and good faith dealing" (Question 18). It assessed punitive damages against Solerwitz in the amount of $1,250,000 and against Lightning Bolt in the amount of $750,000 (Questions 16 and 19).
 
 
 13
 Having found for Smith in every respect, the jury, in accordance with the court's instructions, found it unnecessary to address Lightning Bolt's counterclaim.
 
 B. The Postverdict Rulings
 
 14
 All defendants moved for judgment notwithstanding the verdict ("n.o.v.") or in the alternative for a new trial. In response, Smith conceded that the evidence did not support a finding of $608,446.14 as compensatory damages. The trial court found that $158,446.14 reflected the total compensation to which Smith had been entitled ($100,000 + $200,000) less the total amount he had been paid prior to trial ($141,553.86). As to punitive damages, the court found that the jury's total award of $2,000,000 was far in excess of the amount required to deter defendants and others from similarly violating positions of trust and was so high as to shock the judicial conscience.
 
 
 15
 Accordingly, the court stated that it would grant defendants' motions unless Smith agreed to accept $158,446.14 as compensatory damages from Lightning Bolt, Solerwitz, and S & L, and $500,000 as punitive damages from Lightning Bolt and Solerwitz jointly. Smith so agreed, and defendants' motions for judgment n.o.v. or a new trial were denied.
 
 
 16
 Finding that trial of Smith's claims against Maichin might be postponed for many months or even years because of Maichin's health, that adjudication of Smith's claims had already been delayed, and that further delay might seriously impair Smith's ability to satisfy the judgment against Lightning Bolt, Solerwitz, and S & L, the court concluded that there was no just reason to delay the entry of judgment as to these defendants, and it directed that a final judgment be entered against them.II. DISCUSSION
 
 
 17
 On these appeals, defendants argue principally (1) that they were entitled to judgment n.o.v. because (a) there was no evidence of any misrepresentation by defendants, (b) there was no evidence to support attribution of Solerwitz's actions to S & L, and (c) the jury's award of $608,446 in compensatory damages evinced a lack of understanding of the facts and a failure to follow the trial court's instructions; (2) that, in the alternative, they were entitled to a new trial principally on the ground that the jury's verdict for excessive amounts of compensatory and punitive damages resulted from "passion and prejudice" produced by Smith's counsel's mention of a settlement discussion between the parties; and (3) that any award of punitive damages was improper as a matter of law and insupportable on the evidence. For the reasons below, we affirm the award of compensatory damages, and we vacate the award of punitive damages and remand for further proceedings.
 
 
 18
 A. The Denial of Judgment N.O.V.
 
 
 19
 In ruling on a motion for judgment n.o.v., the district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court " 'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' " Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987) (quoting Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 167 (2d Cir.1980)). The boundaries of the appellate court's review of the denial of a motion for judgment n.o.v. are identical. We may overturn the denial of such a motion only if " ' "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." ' " Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 889 (2d Cir.1988) (quoting Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 712 (2d Cir.1983) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir.1970))). Given this framework, we conclude that defendants' motions for judgment n.o.v. were properly denied in all respects.
 
 1. The Finding of Fraud
 
 20
 Smith's principal claim of fraud was that Lightning Bolt and its two owners, Solerwitz and Maichin, fraudulently induced Smith to enter into the promotion contract with Lightning Bolt by representing to him that the company had the financial ability to promote a championship fight for him. Defendants contend that they were entitled to judgment n.o.v. on this claim chiefly because there was no proof "of any affirmative misrepresentation to Smith regarding the alleged undercapitalization of Lightning Bolt prior to the Costello bout." (Emphasis in original.) We reject this contention on procedural, substantive, and evidentiary grounds.
 
 
 21
 First, so far as we can determine from the record, defendants are procedurally barred from relying on this contention in their attack on the judgment. Generally a party is not entitled to judgment n.o.v. on any ground that he has not raised in a motion for a directed verdict, see, e.g., Baskin v. Hawley, 807 F.2d 1120, 1129-30 (2d Cir.1986); 5A Moore's Federal Practice p 50.08, at 50-74 to 50-75 (2d ed. 1988), and the directed verdict motion must have "state[d] the specific grounds therefor," Fed.R.Civ.P. 50(a). The purpose of the requirement of specificity is to give the claimant a fair "opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." 5A Moore's Federal Practice p 50.08, at 50-77.
 
 
 22
 We have found in the trial record no indication that defendants moved for a directed verdict on the basis of lack of proof of a representation as to Lightning Bolt's financial condition. The record indicates that S & L made no motion whatever addressed to the elements of the fraud count. Solerwitz's sole motion for a directed verdict on the fraud count, made at the close of Smith's direct case, argued only that there was no proof of an intent to deceive and no proof that Lightning Bolt had in fact been unable to finance the bout with Costello. Lightning Bolt moved for a directed verdict on the fraud count both at the close of Smith's case and at the close of all the evidence; but its first motion stated simplistically that "plaintiff has failed to make out a prima faci[e] case"; and its attorney renewed this motion with only the statement, "I don't believe there is any evidence before this Jury of any fraud." A belated specific argument by Lightning Bolt, essentially seeking to renew the motion during a conference on the parties' requested instructions to the jury, made clear that this reference to "fraud" asserted solely a lack of proof of falsity, not any lack of a representation. The sufficiency of proof of a representation as to Lightning Bolt's financial ability apparently was conceded, as Lightning Bolt's attorney argued, "there is no proof at this point, on the signing of the contract that Lightning Bolt did not have the ability to perform under the contract. If they brought in evidence that Lightning Bolt could never get the money to carry out the contract, then there is a deliberate fraud." (Emphasis added.)
 
 
 23
 In all, we see no indication that defendants' motions were sufficiently specific to alert Smith to their present contention that there was simply no proof of any representation as to Lightning Bolt's financial ability.
 
 
 24
 Even if the motions for directed verdict on the fraud claim were sufficiently specific to permit the present attack, however, we conclude that judgment n.o.v. on this claim was properly denied. The jury was instructed that it could find fraud by Lightning Bolt if "Solerwitz and/or Maichin misrepresented the true financial condition of Lightning Bolt or concealed the true financial condition of Lightning Bolt." (Emphasis added.) There was no objection to this instruction. Lightning Bolt stated that it took no exception because it was simply relying on its motion for a directed verdict. Accordingly, the jury was entitled to find that Smith had been defrauded without an express misrepresentation if defendants concealed from him Lightning Bolt's true financial condition.
 
 
 25
 Finally, the evidence at trial was sufficient to support a finding that Lightning Bolt and its officers had made affirmative representations that implied that Lightning Bolt was financially able to promote the bout or that at the very least they had concealed its lack of assets. While Smith was under contract to Top Rank he was pursued from New York to Las Vegas by Solerwitz, who told him Lightning Bolt could get him a championship fight. Solerwitz said he thought Smith had championship potential and that Lightning Bolt "needed to have a champion of the world to be up there with the Bob Arums [Top Rank's principal] and the Don Kings." Between the signing of the legal services contract with Solerwitz and the signing of the May 27 contract with Lightning Bolt, Smith had conversations with Solerwitz and S & L's other principal partner Leonard Leeds involving promotion and expenses. Solerwitz and others discussed prospects of adding other, better known boxers to the fight program in order to sell more tickets and get television coverage. Smith knew that, for his own bout alone, Lightning Bolt was committing itself to pay purses, bonuses, and training expenses totaling $850,000; the record also indicated that substantial amounts of insurance would be required and that Lightning Bolt was required to furnish a letter of credit with respect to promotion costs. Smith estimated that the cost of promoting his own bout would be more than $1 million. He repeatedly asked Solerwitz about expenses, initially focusing principally on training expenses. Solerwitz told him not to worry about "expenses or training or anything."
 
 
 26
 This evidence, while not recounting explicit pre-May 27 representations, was nonetheless sufficient to permit a rational juror to infer that Solerwitz intended his repeated advice to Smith--not to worry about expenses--as a representation of the sufficiency of Lightning Bolt's capital to fund the championship fight and that Smith so understood it. Further, the jury could infer that by telling Smith that Lightning Bolt needed only a world champion in its coterie of boxers in order to rank with the leaders in the fight promotion business, Solerwitz intended to and did convey the impression that Lightning Bolt was in all other respects, including financial capabilities, already comparable to the leaders, Top Rank and Don King Productions.
 
 
 27
 In fact, however, the record contained ample evidence that Lightning Bolt did not have sufficient capital to promote the bout. Maichin testified in his deposition, parts of which were read into evidence at trial, that when the May 27 contract was signed, Lightning Bolt did not have enough assets even to pay Smith the amounts required by that contract. While Lightning Bolt was agreeing to pay Smith the $200,000 bonus upon his winning the championship, Maichin testified that Solerwitz was simultaneously assuring Maichin that the $200,000 would not be paid upon Smith's winning but would instead be spread out over three years. Solerwitz's own trial testimony revealed that in April and May of 1985, Lightning Bolt had little cash in the bank, and no certificates of deposit, treasury bonds, or government bonds. Its only assets, apparently, were a lien-encumbered Rolls Royce and moneys owed it by various other prize fighters. Thus, in July 1985, when Lightning Bolt was supposed to provide a letter of credit to cover the expenses of the bout, it was unable to do so. Maichin was forced to advance his own funds for the payment of the bulk of these expenses. When Smith thereafter learned of Lightning Bolt's financial difficulties and expressed his concern for its ability to pay him, Solerwitz again told him not to worry.
 
 
 28
 After the fight, when Smith asked to be paid the remaining $276,000 due him under the May 27 contract, Solerwitz finally told him Lightning Bolt did not have enough money to pay the $200,000. Solerwitz then gave Smith a check for $76,000 and dissuaded him from seeking to have it certified by introducing him to a man Solerwitz said was an official of Lightning Bolt's bank; this man assured Smith that the funds would be available without the need for certification. Then Lightning Bolt stopped payment on the check. During the period of its dealings with Smith, it never did have as much as $76,000 in its bank account; indeed, other than the $76,000 check on which it stopped payment, Lightning Bolt apparently had never written a check for as much as $10,000.
 
 
 29
 Drawing all inferences in favor of Smith, we conclude that the evidence was sufficient to warrant submission of the fraud claim to the jury and to allow the jury to infer that Solerwitz and Lightning Bolt had represented to Smith that the company was financially able to promote the bout, that that representation was false, and that Smith relied upon it to his detriment.
 
 2. The Role of S & L
 
 30
 We also reject the argument of S & L that it was entitled to judgment n.o.v. for lack of evidence that S & L, as differentiated from Solerwitz and Lightning Bolt, had represented Smith. S & L had only two principal partners, Solerwitz and Leeds. Solerwitz testified, "I--Mr. Leeds, the firm, it was all the same thing." Smith testified that he had met with Solerwitz or Leeds many times in S & L's offices and had discussed legal matters not just with Solerwitz but also with Leeds. Solerwitz's own testimony confirmed that Leeds had worked with Smith, as he stated that it was possible that Leeds had prepared a certain contract for Smith, though Solerwitz "was really working more with Lonnie than Leeds was." (Emphasis added.)
 
 
 31
 The jury was properly instructed that it could not automatically find S & L liable for Solerwitz's actions and that it could impute his actions to the firm only if those actions were part of the ordinary law business of S & L. The evidence was sufficient to permit the jury to infer that Smith was represented by S & L, not just Solerwitz, and that S & L should be held responsible for Solerwitz's breaches of the duties arising out of that representation.
 
 
 32
 3. The Jury's Flawed Verdict on Compensatory Damages
 
 
 33
 Finally, defendants' contention that a conceded error in the jury's calculation of compensatory damages required the entry of judgment n.o.v. is entirely frivolous. If the jury misunderstood or disobeyed the trial court's instructions, the most that defendants could have been awarded was a new trial, not a judgment dismissing the action.
 
 B. The Denial of a New Trial
 
 34
 As an alternative to judgment n.o.v., defendants moved in the district court for a new trial, and they pursue that request in this Court on the grounds, inter alia, that Smith's counsel called settlement negotiations to the jury's attention, causing the jury to base its decision on passion and prejudice; that the jury's award was excessive and unreasonable; and that they should not have been required to go to trial in the absence of Maichin.
 
 
 35
 The district court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir.1983); Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978). The denial of a motion for a new trial will not be reversed unless the denial constituted a clear abuse of discretion. E.g., Bauer v. Raymark Industries, Inc., 849 F.2d 790, 792 (2d Cir.1988); Newmont Mines Ltd. v. Hanover Insurance Co., 784 F.2d 127, 132-33 (2d Cir.1986). We find no such abuse here.
 
 
 36
 Lightning Bolt called as a witness an attorney who had been retained by Smith after the championship bout and after Lightning Bolt refused to pay him the remaining $276,000 due under the May 27 contract. In cross-examining this witness, Smith's attorney asked, "Didn't Lonnie tell you that Mr. Solerwitz wanted to settle this case?" Plainly this question was improper, but the court acted promptly to minimize any damage from it. It immediately struck the question, even before defense counsel could voice an objection, and it cautioned the jury to disregard the question. There was no further mention of the subject within the hearing of the jury. The trial judge was in the best position to assess the effect of the matter on the jury, and we can see no basis for overturning his view that this limited breach did not warrant a new trial.
 
 
 37
 We also reject defendants' attacks on the court's severance of Maichin and the framing of several special verdict questions, including two that included reference to Maichin. As to the severance, it is clear that the district court has broad discretion to order separate trials to avoid delay or prejudice. See, e.g., United States v. 499.472 Acres of Land More or Less, 701 F.2d 545 (5th Cir.1983); Fed.R.Civ.P. 42(b) (court may order separate trials "in furtherance of convenience or to avoid prejudice"); Fed.R.Civ.P. 20(b) (court "may order separate trials or make other orders to prevent delay or prejudice"). Though defendants contend that their ability to defend was impaired by Maichin's absence, Maichin's deposition had been taken, with all parties having the opportunity to attend and ask him questions, and the court was entitled to conclude that any detriment to defendants was outweighed by the likely prejudice to Smith if trial were postponed until Maichin was well enough to proceed--an indefinite period of time. We see no basis for concluding that the severance was an abuse of discretion.
 
 
 38
 Nor is there any basis for defendants' challenge to special verdict questions 14(a), (b), and 18, which asked whether "Solerwitz and/or Maichin" misrepresented Lightning Bolt's financial condition to Smith prior to and after May 27. The particular language to be used in written questions put to the jury for a special verdict lies within the discretion of the trial court. Cann v. Ford Motor Co., 658 F.2d 54, 58 (2d Cir.1981), cert. denied, 456 U.S. 960, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982). In order to preserve for appeal any objection to the form or substance of such questions, a party must object before the jury has retired. Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 710 n. 8 (2d Cir.1983); cf. Fed.R.Civ.P. 49(a).
 
 
 39
 We see no indication in the record that defendants voiced objection to any of the special verdict questions other than numbers 7 and 15. Hence they have no standing to attack any other questions. In any event, we find no abuse of discretion here in the posing or framing of Questions 14(a), (b), and 18 in terms of "Solerwitz and/or Maichin." Lightning Bolt has no valid complaint since Maichin and Solerwitz were its two owners and officers. Questions as to the conduct of these individuals or either of them were thus entirely proper with respect to Smith's claim that he had been defrauded by Lightning Bolt. As to Solerwitz, although these "and/or" questions standing alone might have provided an ambiguous basis on which to sustain a fraud claim against him in his individual capacity and as a partner in S & L, other questions asked the jury about fraudulent representations by Solerwitz alone (e.g., Question 15: "Did Solerwitz abuse his position of trust as Smith's attorney by repeated fraudulent representations and in reckless and callous disregard of Smith's rights?"). The answers to these other questions clarify that the jury found that Solerwitz himself committed fraud.
 
 
 40
 Finally, though there was an error in the jury's calculation of compensatory damages, given the ease with which the provenance of the miscalculation could be identified, it cannot be said that the mistake was the result of "passion and prejudice." The error in the verdict was the jury's calculation of damages in the amount of $608,446.14. That figure was precisely $450,000 more than $158,446.14, the latter representing the unpaid portion of the moneys due Smith under the May 27 contract for his bout against Costello. The derivation of the $450,000 was easily identifiable, for the trial court had told the jury that the May 27 contract also provided that if Smith won the championship, Lightning Bolt would promote three additional bouts for him within the year and pay him at least $150,000 for each title defense. Thus, it is plain that the jury simply added 3 X $150,000 to the amount unpaid for the Costello bout. Since Smith conceded that the $608,446.14 figure was too high and that he had not permitted Lightning Bolt to promote any bouts for him after its failure to pay him the remaining $276,000 called for by the May 27 contract, it was well within the district court's discretion to conclude that a new trial was not warranted if Smith would accept $158,446.14, an amount obviously due.
 
 C. The Award of Punitive Damages
 
 41
 Solerwitz and Lightning Bolt contend that the award against them of punitive damages in the amount of $500,000 should be set aside because (1) such damages are not available for mere breach of contract, and there was insufficient proof of fraud or breach of fiduciary duty; and (2) because the amount of the award is excessive. For the reasons below, we find some merit in Lightning Bolt's contention that as to it the award is excessive. Further, we conclude that it was improper to impose punitive damages against the two defendants jointly.
 
 
 42
 1. The Propriety of Any Award of Punitive Damages
 
 
 43
 Under the law of New York, which governs in this diversity action, punitive damages are not available for a simple breach of contract, see, e.g., Garrity v. Lyle Stuart, Inc., 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976); Bader's Residence for Adults v. Telecom Equipment Corp., 90 A.D.2d 764, 455 N.Y.S.2d 303 (2d Dep't 1982); or for the "ordinary" case of fraud, e.g., Gale v. Kessler, 93 A.D.2d 744, 745, 461 N.Y.S.2d 295, 296 (1st Dep't 1983); Oehlhof v. Solomon, 73 A.D. 329, 334, 76 N.Y.S. 716, 720 (1st Dep't 1902). The availability of such an award is reserved for cases in which the defendant's conduct has constituted "gross, wanton, or willful fraud or other morally culpable conduct" to an extreme degree. Borkowski v. Borkowski, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287 (1976). The requisite degree of culpability may be found in cases where, for example, the fraud on the plaintiff was "not an isolated transaction incident to an otherwise legitimate business, but [was rather] a gross and wanton fraud upon the public," Walker v. Sheldon, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 492, 179 N.E.2d 497, 499 (1961); or where there has been "such a gross disregard of ... contractual obligations as to constitute morally culpable conduct," Hubbell v. Trans World Life Insurance Co., 50 N.Y.2d 899, 901, 430 N.Y.S.2d 589, 590, 408 N.E.2d 918, 919 (1980). In addition, without explicitly relying on the concept of a wrong done to the public, state courts have found pleadings adequate to state a claim for punitive damages where "the wrong involves some violation of duty springing from a relation of trust or confidence," Oehlhof v. Solomon, 73 A.D. at 334, 76 N.Y.S. at 720 (dictum); or where an attorney "abused his professional status by repeated fraudulent representations to plaintiff [a creditor of his client] to its detriment and for his own personal gain" and assisted in placing collateral beyond the reach of the plaintiff, Chase Manhattan Bank, N.A. v. Perla, 65 A.D.2d 207, 209, 212, 411 N.Y.S.2d 66, 67-68, 69 (4th Dep't 1978); or where an attorney abused his professional status and breached his duty of trust and confidence by making repeated misrepresentations to his client, Green v. Leibowitz, 118 A.D.2d 756, 758, 500 N.Y.S.2d 146, 149 (2d Dep't 1986).
 
 
 44
 In fashioning his charge to the jury, Judge Mishler informed the parties that he would rely on Green v. Leibowitz, and his ensuing instructions, to which there was no objection, were in accordance with New York law. Thus, he informed the jury that punitive damages may be assessed against a defendant only where the misconduct was extraordinary and the wrongdoer exhibited a high degree of moral culpability or a total lack of loyalty and good faith. He stated that the jury could exercise its discretion to award punitive damages against Solerwitz if it found that Solerwitz was Smith's lawyer and took advantage of and abused his position of trust and confidence by repeated misrepresentations to and frauds on Smith in a reckless and callous disregard of Smith's rights. The judge stated that the jury could assess such damages against Lightning Bolt if, through the conduct of its officers, Lightning Bolt knowingly and intentionally deceived Smith in callous and reckless disregard of Smith's right to the loyalty, good faith, and fair dealing that he was entitled to expect from Lightning Bolt as his exclusive agent.
 
 
 45
 In answer to various questions in the special verdict, set forth in greater detail in Part I.A. above, the jury found that Solerwitz had acted as Smith's attorney under the April 1985 agreement, that he had been negligent in his representation of Smith, and that he had abused his position of trust as Smith's attorney by repeated fraudulent representations and in reckless and callous disregard of Smith's rights. These answers were supported by the evidence. Though Solerwitz claimed at trial that he had never been Smith's legal representative, the April 1985 agreement, drafted by Solerwitz, stated that Smith "acknowledge[d] that SOLERWITZ is authorized to act as his attorney and legal adviser in negotiations for a championship bout," and stated that "SOLERWITZ will act as SMITH's attorney...." Smith testified that he regarded Solerwitz as his attorney. And Solerwitz testified that though he may have told Smith that Smith was free to have another attorney review the contracts drawn up by Solerwitz, Smith's response was, " 'I'm trusting you with my life and future.' "
 
 
 46
 As to Lightning Bolt, the jury found that one or both of its officers misrepresented Lightning Bolt's true financial condition, that they did so with intent to deceive Smith in order to induce him to enter into the May 27 exclusive promotion agreement, and that they "commit[ted] further acts of deception demonstrating a knowing, intentional, reckless and callous disregard of Smith's right to Lightning Bolt's loyalty and good faith dealing." These findings too were supported by the evidence. As discussed in greater detail in Part II.A.1. above, the jury was entitled to find that there was a stream of misrepresentations to Smith that began prior to the May 27 contract and continued thereafter, even into the period following the championship bout. The misrepresentations ranged from the general (Lightning Bolt's ability to finance the bout) through the specific (its ability to pay Smith the compensation agreed to, and the viability of its $76,000 check).
 
 
 47
 In all, we are persuaded that the evidence was sufficient to permit the jury to find that by repeated fraudulent representations, both Solerwitz and Lightning Bolt violated the duties that arose from their relationships of trust and confidence with Smith and so grossly disregarded these duties that their conduct exhibited a high degree of moral culpability. We conclude that an award of punitive damages was permissible.
 
 2. The Amount of the Award
 
 48
 The jury was properly instructed that if it decided to award punitive damages, it should proceed with calm discretion and sound reason to determine the amount of such an award, and that punitive damages should be fixed in an amount that would warn the defendant and others not to engage in similar conduct but that the amount assessed should not be so high as to result in financial ruin to the defendant so assessed. The jury assessed $750,000 against Lightning Bolt and $1,250,000 against Solerwitz, amounts the district court found to be so high as to shock the judicial conscience, see Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir.1978), and to be far in excess of the amount required to deter these defendants and others from violating positions of trust. Accordingly, with the consent of Smith to the remittitur, the court reduced the punitive damages award to the sum of $500,000 against Lightning Bolt and Solerwitz jointly. Lightning Bolt contends that even the $500,000 award is excessive as against it in light of the jury's implicit finding that it had lacked the assets to fund the championship bout. Solerwitz argues that "[t]he defendant's wealth is clearly a consideration in awarding punitive damages," and that the award is excessive as against him because he is an individual, not a corporation.
 
 
 49
 We find greater merit in the argument of Lightning Bolt than in that of Solerwitz. Notwithstanding defendants' dogged arguments at trial that Lightning Bolt really had been financially able to promote Smith's bout with Costello, the proof was to the contrary. Maichin testified that if he had not come forward with several hundred thousand dollars of his own money, Lightning Bolt would have breached its contractual obligations. As we have discussed above, the evidence was that in 1985 the company had no substantial assets. Assuming no significant change in the fortunes of Lightning Bolt between 1985 and the trial, therefore, the record suggests that a punitive damage award of $500,000 against it constitutes a disproportionately large percentage of its net worth.
 
 
 50
 Accordingly, we conclude that the punitive damage award against Lightning Bolt should be further reduced. See Part II.C.3. below.
 
 
 51
 The record does not indicate that the award of $500,000 is similarly disproportionate to the wealth of Solerwitz. The trial record does not paint as complete a picture of the financial wealth of Solerwitz as it does of Lightning Bolt because Solerwitz's financial condition was not in issue with respect to Smith's underlying claims. See Rupert v. Sellers, 48 A.D.2d 265, 268-69, 368 N.Y.S.2d 904, 909 (4th Dep't 1975) (evidence of defendant's wealth normally inadmissible with respect to claim for compensatory damages). But what evidence there is in the record with respect to Solerwitz's assets does not suggest a lack of wealth. Maichin testified, for example, that when he paid $750,000 for his half-interest in Lightning Bolt (which he had believed was to constitute part of Lightning Bolt's capital), Solerwitz deposited the money in his own account. At trial, Solerwitz claimed that money as his own. There was also evidence that Solerwitz kept on hand $200,000 in cash.
 
 
 52
 The incompleteness of the record as to Solerwitz's net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award. Zarcone v. Perry, 572 F.2d at 56. Since it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages, the preferred method of accommodating the various interests is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all. If the jury finds in favor of the claimant on all of these issues, the parties should then be allowed to present evidence with respect to the amount of the punitive damage award. See Rupert v. Sellers, 48 A.D.2d at 268-72, 368 N.Y.S.2d at 909-12; Varriale v. Saratoga Harness Racing, Inc., 76 A.D.2d 991, 992, 429 N.Y.S.2d 302, 303-04 (3d Dep't 1980).
 
 
 53
 This procedure was not followed in the present case, and the fault for that lies with the defendants. The trial court was not required to order this bifurcation sua sponte. Brink's Inc. v. City of New York, 717 F.2d 700, 707 (2d Cir.1983). Yet defendants did not move for a bifurcated submission of issues to the jury. The single set of special verdict questions submitted to the jury included questions as to the amount of punitive damages the jury believed appropriate; yet defendants did not protest that the inclusion of these questions was premature. Nor did they request any other procedure that would have preserved their ability to present timely evidence with respect to their financial condition.
 
 
 54
 We conclude that Solerwitz is not entitled to challenge on this appeal the procedures followed below, see id., and that he has failed to carry his burden of showing that the award of $500,000 in punitive damages against him is disproportionate to his wealth.
 
 3. Joint Liability for Punitive Damages
 
 55
 Finally, though no party has raised the issue on this appeal, we note that the district court erred in concluding that the liability of Lightning Bolt and Solerwitz for the $500,000 punitive damage award should be joint. The effect of joint liability in a tort context is to excuse one defendant from paying any portion of the judgment if the plaintiff collects the full amount from the other. See Velazquez v. Water Taxi, Inc., 49 N.Y.2d 762, 764, 426 N.Y.S.2d 467, 468, 403 N.E.2d 172, 173 (1980). While this possibility is not necessarily undesirable with respect to a judgment awarding compensatory damages, it is contrary to the policies underlying an award of punitive damages. The latter award is intended in part as a penalty against a defendant who has exhibited a high degree of moral culpability and as a deterrence against further similar conduct by that defendant. Those interests are disserved if the judgment gives such a defendant an opportunity to escape payment of the penalty assessed. Thus imposition of joint liability for a punitive damage award is improper. See Felice v. Delporte, 136 A.D.2d 913, 914, 524 N.Y.S.2d 919, 920 (4th Dep't), appeal pending, 72 N.Y.2d 829, 530 N.Y.S.2d 549, 526 N.E.2d 40 (1988).
 
 4. Proceedings on Remand
 
 56
 In Felice, in vacating a judgment imposing joint liability for punitive damages against two defendants and reducing the amount of the total award, the appellate court apportioned the total award between the two defendants in accordance with the sizes of the jury's individual awards against them. In the present case, the jury assessed punitive damages against Solerwitz and Lightning Bolt in the amounts of $1,250,000 and $750,000, respectively. Were we to follow the lead of the Felice court, we would thus apportion the $500,000, to which the district court reduced the total punitive damage award, 62.5% against Solerwitz and 37.5% against Lightning Bolt. Our willingness to follow that course is affected by our view of the trial record as suggesting that a punitive damage award against Lightning Bolt of even 37.5% of $500,000, or $187,500, may be excessive in light of its financial condition.
 
 
 57
 Our review of the trial record persuades us that an award against Lightning Bolt, individually, of no more than $100,000 should suffice, consistent with what has been revealed as to its financial condition, to serve the goals of such an award. As to Solerwitz, we leave it to the district court on remand to determine the appropriate reduction of the jury's punitive damages award against him, the reduction to be made by the device of a remittitur. In determining the amount of the remittitur, the district court has discretion, if it wishes to exercise it, to allow Solerwitz a brief opportunity to present evidence of his financial condition.
 
 
 58
 On remand, therefore, the court should order a new trial as to the appropriate amount of Lightning Bolt's liability for punitive damages in light of its present financial condition unless Smith agrees to remit all such damages against the company in excess of $100,000. See Wheatley v. Ford, 679 F.2d 1037, 1039 (2d Cir.1982); O'Gee v. Dobbs Houses, Inc., 570 F.2d 1084, 1089-90 (2d Cir.1978). If the court determines that the award against Solerwitz should be in an amount less than $500,000, it should likewise follow the procedure of ordering a new trial as to the appropriate amount of such an award against him unless Smith agrees to a remittitur. Any new trial required in the event Smith rejects remittitur may be limited to the issue of the appropriate amounts of the punitive damage awards, since these issues are distinct from the other issues in the case and the trial court's instructions and special verdict questions sufficiently segmented the issues for consideration by the jury. See Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 755-56 (2d Cir.1984).
 
 CONCLUSION
 
 59
 We have considered all of defendants' arguments on this appeal and, except as indicated above, have found them to be without merit. We affirm so much of the judgment of the district court as awarded Smith compensatory damages against all defendants. We vacate the award of punitive damages and remand for further proceedings not inconsistent with this opinion.
 
 
 60
 Each party shall bear his or its own costs on this appeal.