**Donna K. ERICSON, Plaintiff,**

v.

**CITY OF MERIDEN, Defendant.**

No. 3:99 CV 2143(GLG).

United States District Court,
D. Connecticut.

Dec. 17, 2001.

William G. Madsen, Craig Thomas Dickinson, Madsen & Prestley, Janis C. Jerman, Hartford, CT, for plaintiff.

Anne Noble Walker, Pepe & Hazard, Hartford, CT, Christopher P. Hankins, Corporation Counsel's Office, Meriden, CT, for defendant.

### DECISION

GOETTEL, District Judge.

Following a jury trial on a claim of employment discrimination because of retaliation, in which the jury awarded plaintiff $275,000 in damages, defendant, the City of Meriden (the "City"), moves pursuant to Rule 50 for judgment as a matter of law or, alternatively, pursuant to Rule 59 for a new trial. In order to reach the issue of damages, the jury had to first answer four special interrogatories in favor of plaintiff. We will consider each of these interrogatories separately.

**I.** *Has the plaintiff, Donna K. Ericson, proven that she engaged in a "protected activity" (that is, that she opposed discriminatory conduct related to gender by making a complaint about the conduct or by filing a charge of discrimination)?*

■ This case had its genesis when a reporter visited the City's Highway Department building on an unrelated matter. A number of the Highway Department employees were in a break-room watching a videotape of a television program which has been described as "racy." (Pl.'s Mem.Law Opp'n J. Matter of Law at 4, citing plaintiff's trial exhibit 13.) Plaintiff, the only female employee in the Highway Department, was in the room very briefly while the men were watching the program, but she could still hear parts of it from outside the room. (Trial Transcript 9/17/01, at 29–30.) Concerned that the reporter would write an article condemning the wasting of taxpayers' money by City employees watching videotapes, plaintiff, in her own words, took the following action: "[a]s soon as I could I lifted my phone I dialed the highway manager's number, and I told him to shut the video off that there was a newspaper man out here and that he could hear the laughter and what they were saying." (Tr. 9/17/01, at 30.) Plaintiff stated that playing videotapes of that sort at work occurred all the time and that she had never objected before. When asked what prompted her to tell the highway manager to turn off the video, she responded, "[t]here was a newspaper man there. He was taking a report. He reports to the newspaper. He's a reporter." (*Id.*) Later that day in a routine telephone call from the Director of Public Works, plaintiff advised him that the men had been watching the videotape and that the reporter was there at the time. Plaintiff then informed her immediate supervisor about her conversation with the Director. (*Id.* at 31.)

As noted above, the watching of such videotapes was a fairly common occurrence.

Plaintiff told the newspaper man, who later interviewed her about the situation, "I am not offended here, I am not a prude. This, in my opinion, is not a sexual harassment case nor do I blame the workers here. I understand somewhat the jestful release they have to have because they work very hard. To them, this was just a joke. This is not a smutty issue." (Tr. 9/17/01 at 159.) She also agreed that what she "found offensive was not the videotape of Howard Stern but rather the fact that a supervisor of [her] coworkers permitted [her] coworkers to watch the tape while on the time clock of the City of Meriden." (*Id.*) She also told the reporter that she had not been sexually harassed. (*Id.*) Plaintiff did not object to her male coworkers watching such programs. In her Memorandum of Law in Opposition to Defendant's Motion for Judgment as a Matter of Law, plaintiff claims that "[i]n some respects, she was considered one of the boys who joked around with her coworkers." (Pl.'s Mem.Law at 2, citing trial transcript, pp. 24–26.)

Following the report of the videotape incident, at the request of the Director, plaintiff prepared a list of names of persons who were not watching the video. (This list was not entirely accurate because she listed one or two persons who had, in fact, been watching the video.) (Tr. 9/17/01, at 33–36.) From this list, it was a simple matter to ascertain who, according to plaintiff, had been in the room. When that information was available, those workers and the supervisors were disciplined and lost pay. (*Id.* at 42–43.) Not surprisingly, the coworkers who were disciplined reacted adversely to plaintiff. (*Id.* at 43.) She testified that they shunned her and refused to engage in social conversation with her as they had previously done. (*Id.*) Plaintiff complained that trash was placed on the floor in the women's bathroom. (*Id.* at 47, 51, 55, 58.) On another occasion, plaintiff complained that she heard someone come into the bathroom while she was inside. The evidence was uncontradicted that immediate-ly after this complaint, defendant installed a lock on the outside door of the women's bathroom so that no one could gain access while plaintiff was inside. (Tr. 9/17/01, at 57–58.) Plaintiff also claimed that there were other incidents in which a rat and worms were placed on her car in the parking lot. (Tr. 9/17/01, at 68–69, 72–73.) However, she did not report these incidents to her supervisors.[1] (*Id.* at 70, 73.)

As to other slights of which she complained, plaintiff declined to give the names of the coworkers who had so acted. She did report that she had received anonymous phone calls; however, she could not identify the callers and she did not completely cooperate with the police investigation that was launched. (Tr. 9/17/01, at 129–138.) As to her refusal to give specific names, plaintiff admitted that she refused to do so because she wanted to protect the people she claimed were harassing her. She also complained that certain duties were taken away from her and that a disciplinary report was written concerning her absences from work; however, we do not view these events as amounting to adverse employment action. *See Weeks v. New York,* 273 F.3d 76, 84, 85, 87 Fair Empl.Prac.Cas. (BNA) 161, *available at* 2001 U.S.App. LEXIS 23586, at *12–13 (2d Cir. Oct. 31, 2001) (noting that an adverse employment action is a materially adverse change in the terms and conditions of employment; mere inconvenience or an alteration of job responsibilities are not materially adverse changes). It is clear, however, that plaintiff suffered greatly from the loss of friendly relations with her male coworkers.

At the outset, we note that plaintiff's overhearing snippets of a videotape of a commercially broadcast program (Howard Stern) does not, when reasonably viewed, amount to sexual harassment violating Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq. Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to discrimi-

---

1. Plaintiff argues that defendant must have been aware of these events because she held up the offending articles in the direction of a surveillance monitor covering the parking lot. However, the evidence was uncontradicted that the surveillance camera faced in the opposite direction and would not have picked up these actions even if someone had been watching the monitor at that time. (Tr. 9/17/01, at 172–73.)

natory changes in the terms and conditions of employment). The videotape incident was not so severe and pervasive as to alter the conditions of plaintiff's employment. More important, the report to the Director, which resulted in the subsequent unhappiness of the coworkers with plaintiff, was not directed to the sexual aspects of what occurred, but rather the employment aspects, namely that they should not have spent so much time watching a videotape when they should have been at work and there was a reporter from the local newspaper present. In brief, it was overwhelmingly clear that plaintiff was not opposing discriminatory conduct related to gender, but rather an obvious waste of the taxpayers' money in the presence of a newspaper reporter. While that may be a laudable sentiment, it has nothing to do with a violation of the Civil Rights Act.

## II. *Has the plaintiff proven that she suffered an adverse employment action?*

■ Plaintiff complained bitterly about her male coworkers' attitude toward her following the videotape incident. The appropriate officials were sent to the Highway Department to lecture the male employees about their attitude. According to plaintiff, these efforts produced no results. After a time, plaintiff was temporarily relocated to the Engineering Department at City Hall. The evidence is clear that plaintiff requested a transfer and plaintiff so admitted.[2] (Tr. 9/17/01, at 79.) In order to transfer plaintiff to the Engineering Department at City Hall, it was necessary that another union employee be "bumped."[3] (Tr. 9/17/01, at 84.) The union agreed to the temporary transfer along with plaintiff herself, and she was placed in a position of equal pay and benefits. (Pl.'s Ex. 22.) Shortly thereafter, plaintiff filed a grievance with her union. (Tr. 9/17/01, at 99.) The grievance was denied at the initial stages and was not pursued as it could have

been under the various steps for union grievances. (Pl.'s Ex. 28.)[4] The temporary transfer was made permanent approximately six months later. (Pl.'s Ex. 29.) This transfer was clearly not an adverse employment action but rather an attempt to help ease plaintiff's unhappiness and was done at her own request. (Tr. 9/17/01, at 79, 83.)

Nearly two years after she was first transferred to the Engineering Department, plaintiff's position at City Hall was eliminated from the upcoming year's budget following the institution by the City of a voluntary early retirement program in May of 1999. (Pl.'s Ex. 61, 62.) Plaintiff argues that her position was eliminated by the City in retaliation for the objections she had earlier made. However, the events were not temporally related. Moreover, the City immediately took steps to find another position for plaintiff and she was transferred to the City's library—again without any loss of pay or benefits. (Pl.'s Ex. 63.) Although plaintiff now objects to having been transferred to the library, long before that transfer she had indicated that she was interested in working in the library. (Tr. 9/17/01, at 182.) Plaintiff was informed that a bump might be necessary and she met with her union before the relocation occurred. The union official testified that it was "an environment that [plaintiff] seemed to think she would like to do." (Tr. 9/18/01, at 164.) Indeed, the only adverse result of her two transfers to which plaintiff can reasonably point is the fact that her overtime was reduced and then eliminated, an issue discussed further below.

## III. *Do you find that the plaintiff has proven that the adverse employment action by defendant was substantially motivated by a desire to retaliate for her engaging in the protected activity?*

If plaintiff's report to the Director concerning the work habits of her coworkers

---

2. When a transfer to City Hall was first mentioned, plaintiff objected because a married former lover worked in that same building. Although they did not work in the same offices, plaintiff testified that she saw her former lover every day she worked at City Hall. (Tr. 9/17/01, at 87.) Although plaintiff agreed to the transfer, she apparently did so reluctantly and considered it an involuntary transfer. (*Id.*)

3. When lay-offs are necessary, an employee more senior in length of service may "bump" less senior employees within the division or department, provided he or she has the skill and ability necessary to perform the job. (Pl.'s Ex. 2.)

4. It would have been difficult for the union to support this grievance in light of the fact that they had earlier unequivocally agreed to plaintiff's transfer.

could be considered "protected activity," there was retaliation, but it came from those who had suffered pay losses because of her actions. Plaintiff argues that she suffered "virtually every sort of recognized adverse action short of termination." (Pl.'s Mem. Law at 27.)[5] Plaintiff also maintains that Ms. Beitman, one of defendant's personnel employees, failed to take any action concerning plaintiff's complaints. The uncontradicted evidence was that Ms. Beitman scheduled an appointment to meet plaintiff, but that plaintiff did not show up for the appointment. (Tr. 9/17/01, at 190–91; 9/18/01, at 83–87.) Indeed, the evidence was clear that defendant's employees took several steps to attempt to alleviate plaintiff's unhappiness over her loss of collegiality with her male coworkers. What was established, however, was that their efforts were unsuccessful, at least with respect to some of her coworkers.

 It is true that if unchecked coworker harassment is sufficiently severe, it may constitute adverse employment action. *Richardson v. New York Department of Correctional Service*, 180 F.3d 426, 446 (2d Cir. 1999). In this case, however, the refusal by plaintiff's coworkers to have social conversation with her does not appear sufficiently severe; moreover, efforts were made to check it.[6]

The first transfer to the Engineering Department was in no way precipitated by retaliatory motive. Rather, it was implemented in an effort to alleviate plaintiff's problems with her coworkers. The transfer to the library occurred as a result of the elimination from the budget of her City Hall job and because of a vacancy arising in the library due to early retirement. Both transfers were approved by her union. Furthermore, plaintiff had made it known long before the proposed transfer that she would like to work in the library. (Tr. 9/17/01, at 182.) In summary, except with respect to overtime discussed below, plaintiff suffered no adverse employment action and certainly none that was motivated by a desire to retaliate against her for engaging in a protected activity.

## IV. *Has the plaintiff proven that she sustained damages as a proximate result of defendant's retaliation?*

 Beside the emotional distress which plaintiff testified she suffered because her coworkers shunned her (and which defendant seems to have done everything it could to alleviate) the only damages plaintiff suffered as a result of defendant's alleged retaliation, if any, was that she received much less overtime after her first transfer and no overtime after she was transferred to the library.[7]

Plaintiff had been making substantial overtime while at the Highway Department. However, the work she was performing after normal working hours (such as catch-up work, dusting, and cleaning file cabinets) was precisely the type of non-essential overtime that the City was trying to eliminate in order to save money. (Tr. 9/17/01, at 192–93.) The uncontradicted evidence established that the City's overtime costs were reduced by almost one-half in the two-year period covering 1997 and 1998. (Pl.'s Ex. 4, 5, 6.) There was evidence concerning substantial overtime but only with respect to a small number of employees. Other employees received no over-

---

**5.** In characterizing the purported retaliation, plaintiff's Memorandum of Law badly overstates many items, and indeed, on a couple of matters, is just plain wrong. For example, plaintiff maintains that there were 30 locations and an even greater number of jobs to which plaintiff could have been assigned instead of City Hall. (Pl.'s Mem.Law at 9.) In fact, there were only a handful of other departments with clerical workers from plaintiff's union and a total of only thirty workers in those jobs. (Tr. 9/18/01, at 65.) Plaintiff also claims that she objected to the manner in which her files were delivered to her at City Hall at about the same time that she learned that her job at City Hall might not be funded. (Pl.'s Mem.Law at 13.) In fact, plaintiff

learned that her job had been eliminated more than one year after the filing cabinet incident. (Tr. 9/18/01, at 90–92.)

**6.** We are really uncertain whether an employer can compel coworkers to be sociable with another employee where they have some reason to feel resentful toward the employee.

**7.** Apparently, no one at the library receives overtime. The library has volunteer workers from the community whom they can call on when there is a need to meet unusual work demands. (Tr. 9/18/01, at 13.)

time whatsoever. (*Id.*) Plaintiff does point to some City employees whose overtime increased during the relevant period, but there was no evidence that those employees were similarly situated to plaintiff. In fact, plaintiff testified that she did not know whether clerical workers in the Engineering Department earned overtime in 1998 and 1999. (Tr. 9/18/01, at 22.) Obviously, an employee must work overtime before he or she is entitled to receive compensation for such overtime and there was no guarantee of overtime for any City employee. (Tr. 9/18/01, at 121.) Plaintiff was bumped to the library because of the downsizing in the Engineering Department which resulted in her position at City Hall being eliminated from the budget. (Tr. 9/18/01, at 164, 182; Pl.'s Ex. 61, 62.) Moreover, her claimed overtime loss was a mere fraction of the $275,000 damages award. While a portion of the award may be attributed to her mental suffering during the months her coworkers refused to include her in social conversation, neither of these can justify the size the award given to her.

### THE LAW

There is no real dispute concerning the law which applies to defendant's motion for judgment as a matter of law and alternative motion for a new trial. Judgment as a matter of law is appropriate under Rule 50 where "there is no legally sufficient evidentiary basis for a reasonable jury to find for" a party. Fed.R.Civ.P. 50(a)(1); *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir.1998). The standard for granting judgment as a matter of law during or after trial is the same as the standard for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Judgment as a matter of law is properly granted where "(1) there is such a complete absence of evidence supporting the verdict that the jurors' findings can only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a

verdict against [it]." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998), citing *Cruz v. Local Union No. 3 of the IBEW*, 34 F.3d 1148, 1154 (2d Cir.1994). Naturally, the District Court must consider the evidence in the light most favorable to the non-moving party and must give that party " 'the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The Court cannot assess the weight of the evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' " *Newtown v. Shell Oil Co.*, 2000 WL 49357, *2, 2000 U.S.Dist. LEXIS 417, *6 (D.Conn. Jan. 18, 2000) (quoting *Smith v. Lightning Bolt Productions Inc.*, 861 F.2d 363, 367 (2d Cir.1988)).

With those standards in mind, we nevertheless conclude that the jurors answered the special interrogatories in favor of plaintiff despite a complete absence of evidence supporting the verdict. We also conclude that there was such a overwhelming amount of evidence in favor of defendant that a reasonable, fair-minded person could not have arrived at a verdict in favor of plaintiff. Accordingly, we grant defendant's motion for judgment as a matter of law.

The obvious question, then, is how could the jury have been so wrong? Two explanations suggest themselves. First, jurors seem to have a natural affinity and bias in favor of employees suing their employers. Almost every juror has been an employee and few have ever been employers. For reasons which we cannot explain, this bias becomes more pronounced when the employer is a governmental entity such as defendant in this case. Second, plaintiff's attorney's performance was superior. Although he came into the case very late, replacing another attorney, he did an outstanding job of presenting plaintiff's case.[8]

The Court must also make a conditional ruling on defendant's alternative motion for a new trial under Rule 59. *See* Fed.R.Civ.P. 50(c). A motion for a new trial should be granted to prevent manifest injus-

---

8. Defendant was represented at trial by a member of its Corporation Counsel's office. On this motion, the City is being represented by Pepe & Hazard, one of Connecticut's premier litigation firms.

tice where the trial court is convinced that the jury verdict was against the weight of the evidence and that the jury reached a seriously erroneous result. *See U.S. East Telecomm., Inc., v. U.S. West Communications Servs., Inc.,* 38 F.3d 1289, 1301 (2d Cir.1994); *Piesco v. Koch,* 12 F.3d 332, 344 (2d Cir. 1993); *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992) (quoting *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d at 370). Unlike a motion for judgment as a matter of law under Rule 50, a new trial may be granted even if there is substantial evidence to support the jury's verdict, since the court "is free to weigh the evidence ... and need not view it in the light most favorable to the verdict winner." *Song,* 957 F.2d at 1047. Since we conclude that the facts in this case meet the more stringent requirements under Rule 50 for granting defendant's motion for judgment as a matter of law,[9] we also conclude that this case meets the requirements under Rule 59 for granting defendant's alternative motion for a new trial. Therefore, in the event that the judgment as a matter of law is vacated or reversed, the Court conditionally grants defendant's motion for a new trial, on the ground that the jury reached a seriously erroneous result. *See* Fed.R.Civ.P. 50(c)(1).

For the foregoing reasons, the Court GRANTS defendant's motion for judgment as a matter of law under Rule 50(b) [**Doc. # 62–1**], GRANTS, conditionally, defendant's motion for a new trial under Rule 59 [**Doc. # 62–2**], and DENIES as moot defendant's motion for remittitur.

The clerk of the court is directed to enter judgment accordingly.

SO ORDERED.

---

**9.** With respect to the motion for judgment as a matter of law, the timing of this motion is procedurally correct. Rule 50 requires that a party move for judgment as a matter of law prior to the submission of the case to the jury. Fed. R.Civ.P. 50(a)(2). If the motion is denied, it may be renewed within ten days after the entry of judgment. Fed.R.Civ.P. 50(b). Defendant complied with these requirements and therefore the motion is properly filed.