**TOLTEC FABRICS, INC.,**
Plaintiff–Appellant,

v.

**AUGUST INCORPORATED,**
Defendant–Appellee.

No. 1184, Docket 93–7972.

United States Court of Appeals,
Second Circuit.

Argued March 1, 1994.

Decided: July 8, 1994.

Irwin M. Berg, New York City (Fuchsberg & Fuchsberg, on the brief), for plaintiff-appellant.

Gary S. Jacobson, New York City (Jacobson & Triggs, on the brief), for defendant-appellee.

Before KEARSE and LEVAL, Circuit Judges, and POLLACK, District Judge.*

KEARSE, Circuit Judge:

Plaintiff Toltec Fabrics, Inc. ("Toltec"), appeals from so much of a judgment entered in the United States District Court for the Southern District of New York, following a

---

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

jury trial before James C. Francis IV, *Magistrate Judge,* as awarded defendant August Incorporated ("August") $75,000 for loss of goodwill on August's breach-of-warranty counterclaim arising out of its purchase of supposedly flame-retardant fabrics from Toltec. On appeal, Toltec contends that it was entitled to judgment as a matter of law, or at least a new trial, with respect to the goodwill award. We agree that the evidence presented by August was insufficient as a matter of law to support that award, and we therefore reverse so much of the judgment as awarded $75,000 for loss of goodwill.

## I. BACKGROUND

The evidence at trial, taken in the light most favorable to August, revealed the following events.

### A. *August's Attempt To Purchase Flame–Retardant Fabric*

At the pertinent times, August was a manufacturer of upholstered seating products. It derived a significant portion of its revenue from sales to institutions such as hospitals, nursing homes, colleges, and corporations. Since approximately 1982, August had advertised its furniture as being made with the least-flammable materials available. Toltec was a manufacturer of fabrics and in the late 1980's offered, *inter alia,* a flame-retardant fabric in a 75%/25% blend of so-called "self-extinguishing fabric" ("SEF") and nylon. Toltec was the only manufacturer of this SEF/nylon blend. In 1990, August had discussions with Toltec about two patterns in the SEF/nylon fabric. August emphasized in these discussions that the fabric had to be able to pass a flammability test promulgated by the National Fire Protection Association and known as the "701 small-scale vertical flame test" (the "701 test"). Toltec sent August a laboratory report indicating that one of the patterns in which August was interested had passed the 701 test, and later sent a certification that both had passed the test.

In May 1991, August ordered from Toltec two patterns in the SEF/nylon fabric, plus one other fabric not at issue here, for a total purchase price of approximately $60,000; the price of the two patterns in SEF/nylon fabric was $42,492.50. The transaction was expressly conditioned on the SEF/nylon fabric's ability to pass the 701 test. Having received sample quantities of the SEF/nylon fabric, August sent two chairs upholstered with those patterns to be subjected to the so-called "California 133 full-scale burn test" (the "California 133 test"), a flammability test more stringent and comprehensive than the 701 test. Those chairs passed the test, and August began offering for sale furniture upholstered with the Toltec SEF/nylon fabric, explicitly promoting the products as meeting the standards of the California 133 test.

In October 1991, after receiving production quantities of the SEF/nylon fabric, August sent two more sample chairs to undergo the California 133 test. This time, however, the fabric failed the test. It also failed subsequent 701 tests.

August immediately alerted Toltec to the SEF/nylon fabric's failure to pass the California 133 test. When Toltec responded, it informed August, apparently for the first time, that the fabric could be expected to fail the flammability tests approximately 30% of the time. August demanded that Toltec cure the defect in the fabric so that it would perform as Toltec had warranted to August and as August had advertised to its customers. Toltec did not cure the defect.

August refused to pay Toltec for the ordered fabrics. By mid-January 1992, August had notified its customers that it was withdrawing the SEF/nylon fabric because the fabric did not meet applicable flammability standards. Despite August's offers to substitute other fabrics for the Toltec SEF/nylon fabric that had been shown to customers, some of the orders already received were canceled.

Toltec commenced the present action in February 1992 in New York Supreme Court to collect the purchase price of August's order. August removed the action to federal district court, premising jurisdiction on diversity of citizenship, and filed a counterclaim alleging breach of warranty and fraud. August sought damages, including an award

for loss of goodwill and punitive damages, in excess of $1,140,000.

### B. *The Proceedings Before the Magistrate Judge*

The case was tried in March 1993 before a magistrate judge, pursuant to the agreement of the parties. *See* 28 U.S.C. § 636(c) (1988); Fed.R.Civ.P. 73. At trial, August offered evidence of the above events. As discussed in greater detail in Part II.B. below, August introduced two types of evidence to support its claim of loss of goodwill. August's principal officers testified that some of the customers who would have purchased August furniture if available with SEF/nylon fabric, declined to purchase from August after August declined to use that fabric. In addition, August called a certified public accountant who testified that though August had made profits in 1990 and 1991, it had suffered a loss in 1992, which diminished its goodwill.

The jury returned a special verdict finding that August was not obligated to pay Toltec for the fabrics August had ordered, and finding that Toltec, though not having fraudulently misrepresented the properties of the SEF/nylon fabric, had breached its warranty with respect to that fabric. On account of the breach of warranty, the jury awarded August a total of $108,354, consisting of $29,638 for expenses of marketing, shipping, testing, and withdrawing chairs made with SEF/nylon fabric from the market, $3,716 for profits lost due to canceled orders or fabric substitution, and $75,000 for diminution of goodwill.

Following the verdict, Toltec moved for judgment in its favor as a matter of law or, in the alternative, for a new trial, challenging several aspects of the jury award, including the award for loss of goodwill. In a Memorandum and Order dated August 27, 1993, the magistrate judge denied the motion in its entirety. As to the award for loss of goodwill, the magistrate judge ruled, *inter alia,* that August's circumstantial evidence of customer loss sufficed to support the jury's conclusion that Toltec's breach had caused the loss of goodwill and that there was sufficient evidence to support the jury's quantification of that loss.

This appeal followed.

## II. DISCUSSION

On appeal, Toltec does not challenge the award of damages for expenses and lost profits on actual sales or canceled orders. It contends only that the magistrate judge erred when he refused to grant judgment as a matter of law, or a new trial, with respect to the damages awarded for loss of goodwill. Toltec argues principally that such damages were inappropriate because (1) there was insufficient proof that any loss of goodwill was caused by Toltec's breach, and (2) the evidence as to the amount of any such loss was so speculative that the issue should not have been submitted to the jury. We agree, and we therefore reverse so much of the judgment as awarded those damages.

### A. *The Legal Principles*

Two sets of well-defined legal principles govern this appeal: the substantive law of New York governing the availability of damages for loss of goodwill, and the procedural standard for reviewing motions for judgment as a matter of law.

#### 1. *New York Law Governing Claims for Loss of Goodwill*

New York law permits a breach-of-warranty claimant to recover for loss of goodwill, which is sometimes referred to as loss of future profits, or loss of customers, or damage to reputation. *See Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp.,* 47 A.D.2d 852, 853, 366 N.Y.S.2d 194, 196 (2d Dep't) (mem.) ("loss of goodwill, injury to reputation and loss of profit"), *appeal dismissed,* 37 N.Y.2d 793, 375 N.Y.S.2d 106, 337 N.E.2d 612 (1975); *see also General Riveters, Inc. v. Morse Chain Co.,* 15 A.D.2d 859, 860, 224 N.Y.S.2d 746, 748 (4th Dep't 1962) (mem.) ("loss of profits because of injury to ... reputation"); *Moran v. Standard Oil Co.,* 211 N.Y. 187, 195, 105 N.E. 217 (1914) (Cardozo, J.) (noting that recovery should be allowed for "loss of profits resulting from the alienation of the customers"); *Consolidated*

*Data Terminals v. Applied Digital Data Systems, Inc.,* 708 F.2d 385, 394 (9th Cir. 1983) (*"Consolidated Data"*) (applying New York law and noting that recovery for consequential damages was permissible because defendant knew plaintiff "would suffer a loss of goodwill with its customers because the customers would blame [plaintiff] for the product failures, and would become more reluctant to buy equipment from [plaintiff] in the future"); *Trimed, Inc. v. Sherwood Medical Co.,* 977 F.2d 885, 893 (4th Cir.1992) (applying New York law and allowing as consequential damages "loss in value of the business as a going concern due to loss of customer goodwill"). However, New York law permits recovery for loss of goodwill only if the claimant meets certain stringent requirements of proof. *See, e.g., Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp.,* 47 A.D.2d at 853, 366 N.Y.S.2d at 196. *See generally Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986) (per curiam) (*"Kenford"*); *Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 332 (2d Cir.1993) (*"Trademark Research"*) (applying New York law).

█ First, the claimant must show that in fact there was a loss of goodwill. "[T]he alleged loss must be capable of proof with reasonable certainty," and "may not be merely speculative, possible or imaginary." *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235; *see also Trademark Research,* 995 F.2d at 332; *Moran v. Standard Oil Co.,* 211 N.Y. at 195, 105 N.E. 217 (Cardozo, J.) ("loss of profits resulting from the alienation of the customers ... ought to be proved with reasonable certainty").

Second, the claimant must present objective proof of the amount of that loss. *See, e.g., Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235; *Trademark Research,* 995 F.2d at 332. The loss must be "reasonably certain in amount," and an award cannot stand if based on "little more than guesswork." *Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp.,* 47 A.D.2d at 853, 366 N.Y.S.2d at 196; *see also Agricultural Services Association, Inc. v. Ferry-Morse Seed Co.,* 551 F.2d 1057, 1072 (6th Cir.1977) (reviewing goodwill award under Tennessee law, and stating, "[t]o set a quantifiable damage figure arbitrarily is impermissible.").

Third, the claimant must show that the loss was caused by the opposing party's breach. "[I]t must be demonstrated with certainty that such damages have been caused by the breach," and are "directly traceable to the breach, not remote or the result of other intervening causes." *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235; *see also Trademark Research,* 995 F.2d at 332; *Robert T. Donaldson, Inc. v. Aggregate Surfacing Corp.,* 47 A.D.2d at 853, 366 N.Y.S.2d at 196 (loss-of-future-profits damages "must be traceable with reasonable certainty to the breach").

These requirements have often resulted in the reversal of jury awards for loss of future profits. Reversing such an award in *Trademark Research,* for example, this Court observed that the evidence failed to prove such losses with reasonable certainty because it was based on speculative market assumptions. The proffered calculation "assumed an abrupt expansion of the market ..., assumed that [plaintiff] would reverse the long decline in its market share, [and] assumed that [plaintiff's] historically aggressive competitors would take no measures to counter [plaintiff's] ascendancy." 995 F.2d at 333. As a result, we concluded that the "lost profits presentation depended entirely on speculation of a particularly dubious kind." *Id.; cf. Care Travel Co. v. Pan American World Airways, Inc.,* 944 F.2d 983, 994 n. 8 (2d Cir.1991) (upholding award of lost profits where proof was detailed, specific, and grounded in facts, and supplied "the jury ... with a basis for multiple mathematical calculations capable of determining with some specificity the financial repercussions of [defendant's] breach" (internal quotes omitted)).

In sum, in order to recover for loss of goodwill, or future profits, the claimant must prove with reasonable certainty, *inter alia,* (1) the fact of a loss of goodwill, (2) the amount of that loss, and (3) the direct causation of that loss by the defendant's breach. *See also Trademark Research,* 995 F.2d at 332 (" 'In addition, there must be a showing

that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.'" (quoting *Kenford,* 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235)). Such stringent requirements of proof are imposed because without them "it is difficult to see what limits are to be set to the recovery of such damages in any case where defective goods are sold and the vendee loses customers." *Armstrong Rubber Co. v. Griffith,* 43 F.2d 689, 691 (2d Cir.1930) (A. Hand, J.).

### 2. *Judgment as a Matter of Law*

■ The standards governing the review of a motion for judgment pursuant to Fed. R.Civ.P. 50 as a matter of law ("judgment m.o.l."), formerly termed, *inter alia,* a motion for judgment notwithstanding the verdict ("n.o.v."), are clearly established. *See generally Piesco v. Koch,* 12 F.3d 332, 340 (2d Cir.1993) (amendment in 1991 changing terminology of Rule 50 did not change substance). When faced with such a motion, the trial court must consider the evidence in the light most favorable to the nonmoving party and must "give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 367 (2d Cir.1988). The court is not allowed to weigh conflicting evidence, or assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See id.*

The same principles apply to an appellate court's review of the denial of a motion for judgment m.o.l. The court of appeals may overturn the denial of such a motion only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 889 (2d Cir.1988) (internal quotes omitted).

### B. *The Evidence as to August's Claim of Loss of Goodwill*

■ In light of the above principles, therefore, we must determine, after viewing the evidence in the light most favorable to August and giving August the benefit of all reasonable favorable inferences that the jury might have drawn from the evidence, whether August met its burden of proving with reasonable certainty that it lost goodwill or future profits, that the amount of that loss was at least $75,000, and that any such loss was directly traceable to Toltec's breach of warranty. We turn to the testimony of August's three witnesses on those issues: its president Lee Harold Fister, its vice president Judith Fister, and its accountant Dennis Hughes. The Fisters identified customers who had placed orders for chairs made by August with SEF/nylon fabric and sought to show that August had received no orders from those customers from the time of August's announced withdrawal of that fabric through the time of trial, a 14-month period.

Lee Fister testified that August had received seven orders for furniture made with the Toltec SEF/nylon fabric. After August informed those customers that the SEF/nylon fabric would not be used, three of those customers canceled their orders. Four orders were not canceled. Of the three orders that were canceled, one was for $25,899, one was for $15,075, and one was for $168.

Lee Fister also testified, without elaboration, that he had also had "nine to ten" customers lined up who would have bought chairs covered with the SEF/nylon fabric. (Tr. 476.) None of these prospects, however, actually placed orders with August for chairs made with that fabric. We have seen no evidence as to whether those 9–10 unidentified prospective customers had ever previously placed orders with August or placed any orders with August after its withdrawal of the SEF/nylon fabric. Judith Fister identified two companies to whom August had been attempting to sell chairs made with SEF/nylon fabric. One had made some large purchases from August in the past; there was no evidence of past purchases by the other. Neither of the companies she identified placed orders with August for chairs made with SEF/nylon fabric, and neither placed any orders with August thereafter.

As to the seven customers that had placed orders for chairs made with SEF/nylon fab-

ric, there was evidence of August's past dealings with two. Judith Fister testified that the company that had placed and canceled a $25,899 order had previously placed orders with August of approximately $20,000 a year. That company had not placed any new orders with August in the 14–month interval between August's withdrawal of the SEF/nylon fabric and the time of trial. Lee Fister testified that one customer that had ordered SEF/nylon-upholstered chairs, and had not canceled its order, had previously placed orders with August totaling more than $100,000 a year. That customer had not placed a new order with August in the 14 months since the withdrawal of the SEF/nylon fabric. Though testifying to these levels of past dealings, the witnesses did not testify as to the length of August's dealings with either of these customers or as to the amount of profits, if any, August had realized on the prior sales.

As to the other five customers who placed orders for chairs made with SEF/nylon fabric, August presented no evidence of prior orders. As for subsequent business, August received no orders from one company that canceled and no new orders from one company that did not cancel. There was no evidence as to whether August had done further business with the remaining three companies that had placed orders. Lee Fister testified on cross-examination as follows:

Q. Do you still do business with any of those people?

A. I'm not positive of this. I can tell you ones that I know and don't, but if you're going to ask me about all seven as a group—

Q. Yes. Did you ever fill another order or get another contract from any of those seven again?

A. Shall I go down the list?

Q. Just look and say yes or no. I mean, just look at the list?

A. OLI, no—

Q. You don't have to do that.

Is there anybody there?

A. To the best—now, this is what's why I am telling you. There's one I'm not certain about.

Q. I'll tell you what, Mr. Fister, I am going to withdraw the question. It doesn't matter. I will withdraw the question.

A. OK.

(Tr. 545.)

Lee Fister testified that as to the seven customers from which August had received orders, he had no documents from any company stating that it would not do business from August in the future. August presented evidence that Toltec's SEF/nylon fabric remained available from August's competitors.

Hughes, August's accountant for some 10 years, testified as an expert. On direct examination, he testified that he had been asked to review the company's financial situation for the years 1990 through 1992 and to formulate an opinion as to its value. He testified that, as an accountant, he used the term "goodwill" to characterize "a number of factors that relate to the success of [a] business: quality management, good credit rating, things of that nature, basically intangible qualities that make the business successful" (Tr. 290), and that "the goodwill value of [a] company is determined by the earnings stream that it generates" (*id.* 296). August presented evidence that it had had profits of nearly $50,000 and $49,000 in 1990 and 1991, respectively, compared to a loss of $51,000 in 1992. Hughes opined that in 1992 the company decreased in value by $600,000, virtually all of which he characterized as a "loss of goodwill." (*Id.* 295.) Hughes opined that the factors that would have contributed to August's 1992 loss included the "legal expense that was being incurred" in the dispute with Toltec—"[t]hat was probably the main one"—and the new costs associated with "[t]he flame testing." (*Id.* 299.) As to what other factors had negatively impacted August's 1992 performance, Hughes testified, "I'm not aware of any other factors which should have contributed to the results of operations of August in 1992." (*Id.*)

On cross-examination, Hughes testified that August's goodwill was lower because its 1992 earnings were lower and that he "d[id]n't know of all the reasons why the earnings were less. The sales were lower; the company had a loss." (*Id.* 313–14.)

Asked whether he had an opinion as to "what the diminution in sales was from," Hughes responded, "I really, really don't have an opinion for that." (*Id.* 316.) Asked whether he was testifying that "the profits of August went down in 1992 . . . due to a $60,000 order that didn't comply with certain warranties or guarantees," Hughes responded, "No, sir." (*Id.* 309.) Asked whether he thought August's goodwill was lower at the end of 1992 "because of something Toltec did," he responded, "I never said that." (*Id.* 313.)

Even taking all of the evidence in the light most favorable to August, we cannot conclude that that evidence sufficed to meet the stringent requirements that August prove with reasonable certainty that it lost customers because of Toltec's breach of warranty and that it would have received future profits of at least $75,000 from those customers. First, we note that given the relatively short interval between August's withdrawal of the fabric and the time of trial, combined with the nature of August's business, August had a difficult task in attempting to prove the loss of customers, as contrasted with merely the loss of sales on canceled orders for SEF/nylon-upholstered chairs. Unlike a retail sales business where customers might shop daily, weekly, or monthly, August's business consisted in large part of manufacturing upholstered seating products upon receipt of orders from institutional customers. Thus, unless there were proof of a consistent pattern of frequent ordering by a specific customer, a 14–month period in which no orders were received from that customer might well not warrant an inference that that customer meant to place no further orders. For example, Judith Fister testified that the company that placed and canceled the $25,-899 order for SEF/nylon-upholstered chairs normally placed orders of approximately $20,000 a year. Without any indication from the company itself that it intended not to do further business with August, the lack of additional orders in a period as short as 14 months could not produce the requisite level of certainty that there were to be no further orders. As to all but one of the remaining companies that placed orders with August for SEF/nylon-upholstered chairs, there was no evidence of any prior sales by August, and hence no evidence of a pattern of orders, and no basis for inferring with reasonable certainty that there would have been future sales. Further, for several of the customers that ordered, there was no evidence that they had not in fact ordered from August again.

Second, there was no proof that the failure of any company to place orders with August during the 14–month period that followed August's withdrawal of the SEF/nylon fabric was directly caused by that withdrawal. No evidence was presented as to the reason for any company's failure to place recent orders with August, and August's effort to attribute the lack of such orders to its withdrawal of the SEF/nylon fabric is speculative. As to any company that had not even placed an order for chairs made with SEF/nylon fabric, it would be the height of conjecture to conclude that a failure to place later orders was causally linked to August's withdrawal of a fabric that that company had not ordered. Such a conclusion would be especially fanciful as to those nonordering prospects (*i.e.*, all but one) that had not even been shown to have ordered from August in the past.

Nor was there sufficient causation evidence as to the four companies that the Fisters testified had placed orders for chairs made with SEF/nylon fabric but had not placed orders with August since that withdrawal. Two of those customers, one of which had placed annual orders of more than $100,000, did not cancel their orders with August in the wake of that withdrawal. Without some proof as to the company's reason for not placing new orders, a jury could not with reasonable certainty attribute the lack of recent orders to that withdrawal, especially since those customers did not in fact cancel the very orders that had initially called for use of the SEF/nylon fabric even though SEF/nylon fabric was available from other sources. The Fisters were properly prevented from giving their own views as to the reasons any customers might have had for not placing recent orders with August. August did not call any customers to testify.

Finally, there was no evidence from which the jury could rationally calculate any specific number as representing the amount of

future profits that August would have earned from any lost customer. There was evidence as to the historical level of its sales to only two companies that ordered SEF/nylon-upholstered chairs; and there was no evidence whatever as to August's profits on those past sales.

August's evidence of loss of goodwill did not meet the requirements of New York law, and Toltec was therefore entitled to judgment as a matter of law dismissing August's claim for such damages.

## CONCLUSION

We have considered all of August's arguments in support of the award for loss of goodwill and have found them to be without merit. The judgment is vacated, and the matter is remanded for the entry of a new judgment omitting that award.

Costs to Toltec.