Michael Christopher MILANO, an infant, by his parents and natural guardians, Christopher MILANO and Jeanne Milano, and Christopher Milano and Jeanne Milano, individually, Plaintiffs–Appellants,

v.

Jay A. FREED, Marvin A. Lieber, Arnold W. Scherz, Mitchell Kleinberg, and Stephanie Citerman, Individually and d/b/a Freed Lieber Scherz Kleinberg and Citerman, a partnership, Richard Silvergleid, Manhasset Diagnostic Imaging, P.C., and Alan D. Rosenthal, Defendants–Appellees.

No. 1886, Docket 95–7048.

United States Court of Appeals, Second Circuit.

Argued June 23, 1995.

Decided Aug. 25, 1995.

Kramer & Kramer, New York City (Edward C. Kramer, Joseph Meyers, Samuel Frankel, of counsel) for appellants.

Heidell, Pittoni, Murphy & Bach, P.C., New York City (Charles L. Bach, Jr., Daniel S. Ratner, of counsel) for appellees Jay A. Freed, Marvin A. Lieber, Arnold W. Scherz, Mitchell Kleinberg, Stephanie Citerman, and Freed Lieber Scherz Kleinberg and Citerman.

Schaub, Ahmuty, Citrin & Spratt, Lake Success, NY (Steven J. Ahmuty, Jr., of counsel) for appellee Alan D. Rosenthal.

Rossano, Mose, Hirschhorn & Corleto, P.C., Garden City, NY (Madeleine S. Hirschhorn, of counsel) for appellees Richard Silvergleid and Manhasset Diagnostic Imaging, P.C.

Before: WALKER, McLAUGHLIN, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

Michael Milano and his parents, Christopher and Jeanne Milano, appeal from a judgment entered by the United States District Court for the Eastern District of New York (Nicholas Tsoucalas, Judge[1]), which dismissed their medical malpractice action against various doctors who treated Michael before it was discovered that he suffered from a malignant tumor.[2] The Milanos brought suit claiming that the doctors' failure to refer Michael to a pediatric neurologist constituted malpractice, which, by delaying the diagnosis of Michael's tumor, aggravated the harms Michael suffered. Upon the defendants' motion at the close of the Milanos' presentation of evidence at trial, the District Court ruled as a matter of law that the Milanos had failed to establish a *prima facie* case of medical malpractice against any of the defendants, and ordered dismissal of all the Milanos' claims. We find, instead, that the Milanos presented enough evidence to support a jury finding of malpractice against three of the defendant doctors. We there-fore reverse the judgment dismissing the Milanos' action with respect to these doctors and their partners, affirm with respect to the other defendants, and remand for further proceedings.

## BACKGROUND

*Michael Milano's Medical History.* Michael Milano was born to Jeanne and Christopher Milano on March 1, 1988. Though Michael appeared healthy at birth, when he was 4½-months old it was discovered that he had developed a neuroblastoma, a malignant tumor on his spine. The tumor was apparently eradicated as a result of a long course of chemotherapy, but Michael was left a paraplegic with various additional permanent injuries.

Prior to the discovery of the tumor, Michael had been seen principally by doctors at the "Freed Group." Jeanne Milano had met defendant Dr. Jay A. Freed during her pregnancy. Based on his description of his pediatric partnership and its practices, the Milanos decided to have Dr. Freed's medical group serve as Michael's pediatricians.

On March 15, 1988, two weeks following his birth, Michael had his first appointment with the Freed Group and was examined by defendant Dr. Stephanie Citerman. The initial visit was uneventful, except for some minor concerns about jaundice.

According to the trial testimony, during the two weeks after this appointment Michael first began to manifest a number of unusual symptoms. Michael's parents, Christopher and Jeanne, as well as Jeanne's parents noticed that Michael had abnormal stomach movements when he breathed; that he had limited leg movement even though his legs would shake strangely when touched; that he often vomited after feedings; that he had a weak cry; that he had a tendency to lean to the right; and that he had only a limited ability to lift his head.

---

1. The Honorable Nicholas Tsoucalas, Judge of the United States Court of International Trade, sitting by designation.

2. Also named in the Milanos' complaint are Manhasset Diagnostic Imaging, P.C., a professional corporation for which one of the defendant doctors worked, and the partners of two of the other defendant doctors.

At Michael's next scheduled appointment with the Freed Group on March 30, 1995, these symptoms were reported to defendant Dr. Mitchell Kleinberg. Both Jeanne and her mother, who made a special effort to accompany her daughter and grandson on this visit, testified that they told Dr. Kleinberg about all of Michael's unusual ailments. After conducting a quick exam, however, Dr. Kleinberg expressed no concern about Michael's condition and suggested that Jeanne was overfeeding her son.

Over the next few weeks, Michael's parents observed that his symptoms were becoming more pronounced. Worried about her son's worsening condition, Jeanne moved up Michael's scheduled visit to the Freed Group. And on April 19, 1988, Jeanne and her mother told Dr. Freed about all the symptoms that they had seen over the previous month. After a five-minute examination, Dr. Freed, like Dr. Kleinberg before him, expressed no significant concerns about the infant's health. Dr. Freed explained that any problems with Michael's legs could be attributed to an underdeveloped circulatory or nervous system, which the pediatrician said was common in babies. And, still according to Jeanne's trial testimony, Dr. Freed accounted for Michael's other ailments by declaring that he was a "slow starter" and "lazy." Jeanne was again told that she was overfeeding Michael, and Dr. Freed added that she "was just being a very nervous, first-time mother."

Dr. Freed's diagnosis notwithstanding, Michael continued to manifest the same distressing symptoms over the next month. He regularly vomited after feeding, his stomach moved abnormally when he breathed, his legs continued to shake to an unusual degree, he leaned to the right, his extremities on the right side were cold to the touch, and his cry grew even weaker.

Troubled by his son's condition, Christopher took time off from work to accompany his wife at Michael's next scheduled visit with the Freed Group on May 19, 1988. At this appointment, Jeanne and Christopher reported to Dr. Kleinberg that Michael's symptoms seemed to be getting progressively worse. Dr. Kleinberg looked at Michael's head and told the Milanos that he suspected Michael had craniosynostosis, a condition in which the bones in an infant's head grow together prematurely. Dr. Kleinberg suggested that Michael's symptoms could be attributed to this problem, which was correctable through surgery, and he referred the Milanos to defendant Dr. Alan D. Rosenthal, a pediatric neurosurgeon.

The Milanos saw Dr. Rosenthal just over a week later, on May 31, 1988. According to the trial testimony, all of Michael's symptoms were described to Dr. Rosenthal. Dr. Rosenthal conducted a brief examination of Michael's head. He then explained to the Milanos what craniosynostosis is and how it can be corrected surgically. Dr. Rosenthal said he wanted Michael to undergo a set of diagnostic tests—a CAT scan and a 3–D reconstruction of his head—and made an appointment for the next day with defendant Dr. Richard Silvergleid, a radiologist.

On June 1, 1988, Dr. Silvergleid performed a CAT scan and a 3–D reconstruction of Michael's head at the offices of defendant Manhasset Diagnostic Imaging, P.C. In a letter to Dr. Rosenthal dated that same day, Dr. Silvergleid wrote that the CAT scan indicated that Michael did suffer from craniosynostosis.

After a couple of phone calls, Jeanne was able to contact Dr. Rosenthal about the results of her son's tests. On June 14, 1988, Dr. Rosenthal explained to Jeanne that the CAT scan and 3–D reconstruction had confirmed his diagnosis of craniosynostosis. During their conversation, Dr. Rosenthal reassured Jeanne that Michael would be fine following corrective surgery. In a telephone conversation the following week, Dr. Rosenthal reported to Jeanne that a meeting had been arranged for early July to discuss the details of Michael's surgery.

Concerned about Michael's still worsening condition, and perhaps troubled by the prospect of an operation, the Milanos and Jeanne's parents decided to seek a second opinion. An appointment was made for July 1, 1988 with Dr. Peter Carmel, a pediatric neurosurgeon not associated with the Freed Group. After hearing Michael's medical his-

tory, examining the child's head, and reviewing the CAT scan and 3–D reconstruction, Dr. Carmel conjectured that Michael's problems were not related to his skull, but to his brain. Accordingly, Dr. Carmel referred the Milanos to two pediatric neurologists and urged them to go to whichever one could see them first. The Milanos were able to schedule a visit with Dr. Steven Pavlakis for July 15, 1988.

Meanwhile, during the first week of July, Michael developed a high fever. On July 5, 1988, Dr. Freed saw Michael about the fever, which he diagnosed as related to a childhood virus and for which he prescribed Tylenol. When Michael's fever persisted over the next week, Dr. Freed instructed Jeanne to keep administering Tylenol.

On July 15, 1988, the Milanos met with Dr. Pavlakis. After hearing the Milanos' description of Michael's ailments and examining the child, Dr. Pavlakis concluded that Michael's problems could well be neurological. Because Michael was still running a fever, Dr. Pavlakis also decided to order a chest x-ray.

The chest x-ray was taken on July 19, 1988, and revealed the tumor on Michael's spine. After a biopsy confirmed the presence of the malignancy, chemotherapy was started. As noted before, though the tumor was apparently eradicated, Michael still suffered permanent damage, most notably paralysis below his waist.

*This Lawsuit.* In January 1991, basing jurisdiction on diversity of citizenship, the Milanos brought this suit in federal court against Drs. Freed and Kleinberg, the pediatricians who initially treated Michael, and against Drs. Rosenthal and Silvergleid, the neurosurgeon and the radiologist to whom he was referred. Also named in the complaint, as vicariously liable, were the other partners in the Freed Group and the medical corporation, Manhasset Diagnostic Imaging, P.C., for whom Dr. Silvergleid worked. The Milanos' complaint alleged that the defendants had failed to treat Michael "in accordance with standards of care and treatment generally established in the community." As developed at trial, the Milanos' theory of the case was that the defendant doctors committed malpractice by failing to refer Michael to a pediatric neurologist. According to the Milanos, this "failure to refer" led to Michael's tumor being discovered later than it otherwise would have been, and this in turn served to aggravate the permanent harm suffered by Michael.

Prior to trial, the defendants moved to bifurcate the issues of liability and damages. After a hearing, the District Court granted the motion and ordered that liability and damages be tried separately.

The liability phase of the Milanos' action proceeded to trial in December of 1994. The Milanos opened their case by testifying at length about Michael's early symptoms and their encounters with the defendant doctors. The Milanos also offered into evidence a videotape of family scenes, from which Michael's condition could be observed as early as May 1988. Finally, the Milanos presented the testimony of Dr. Pavlakis and another pediatric neurologist, Dr. David Kaufman. Both testified as to whether the defendant doctors should have referred the Milanos to a pediatric neurologist, whether Michael's tumor might have been discovered earlier had this been done, and whether Michael's injuries would have been lessened had there been an earlier diagnosis.

At the close of the Milanos' presentation of evidence, all of the defendants moved for judgment as a matter of law. The District Court first dismissed the action against Dr. Citerman, whose treatment of Michael had not been questioned and who was only being sued vicariously as a partner in the Freed Group. In the District Court's view, no evidence had been advanced to indicate that she was in fact a partner. The District Court then held that there was no evidence that Dr. Silvergleid, the radiologist who had performed Michael's CAT scan and 3–D reconstruction, had departed from accepted medical practice. Turning then to the doctors in the Freed Group and to Dr. Rosenthal, the pediatric neurosurgeon to whom Michael had been referred, the District Court found that there was no evidence that they had deviated from accepted medical practice. Since it concluded that all the defendants were entitled

to judgment as a matter of law, the District Court entered a final judgment dismissing the Milanos' action against all of the defendants.

## DISCUSSION

In deciding whether a party is entitled to judgment as a matter of law under Fed. R.Civ.P. 50, a trial court "is not allowed to weigh conflicting evidence, or assess the credibility of the witnesses, or substitute its judgment for that of the jury." *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 782 (2d Cir.1994). Consequently, in reviewing the District Court's grant of judgment in favor of the doctors, our task is to "determine whether, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of plaintiff, a reasonable jury could only have found for the defendants." *In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1131 (2d Cir.1995).

Having reviewed the evidence presented by the Milanos at trial in the light of these standards, we conclude that only three of the named defendants, Dr. Citerman, Dr. Silvergleid and Manhasset Diagnostic Imaging, P.C., were entitled to judgment as a matter of law. Because the Milanos presented sufficient evidence to raise jury questions as to whether Drs. Freed, Kleinberg, and Rosenthal committed malpractice which caused at least some of Michael's injuries, we reverse the portion of the District Court's judgment dismissing the Milanos' action against them and their partners and remand for further proceedings.

### I. Medical Malpractice

As this Court recently noted, to establish a claim of "medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir.1994) (citing New York cases). *Accord Amsler v. Verrilli*, 119 A.D.2d 786, 786, 501 N.Y.S.2d 411, 412 (2d Dep't 1986) ("The requisite elements of proof in a medical malpractice case are (1) a deviation or departure from accept-ed practice and (2) evidence that such departure was a proximate cause of injury or damage."). New York law further provides that, "except as to matters within the ordinary experience and knowledge of laymen, ... expert medical opinion evidence is required" to make out both of these elements. *Fiore v. Galang*, 64 N.Y.2d 999, 1001, 489 N.Y.S.2d 47, 48, 478 N.E.2d 188, 189 (1985). *See also Gibson v. D'Amico*, 97 A.D.2d 905, 906–07, 470 N.Y.S.2d 739, 741 (3d Dep't 1983) (explaining that medical malpractice actions generally require "expert opinion testimony of the standard of care in the community"), *appeal denied*, 61 N.Y.2d 603, 472 N.Y.S.2d 1027, 460 N.E.2d 1360 (1984); *Monahan v. Weichert*, 82 A.D.2d 102, 107, 442 N.Y.S.2d 295, 298 (4th Dep't 1981) ("Ordinarily, expert medical opinion testimony is required to establish proximate cause and make out a prima facie case of medical malpractice....").

The defendants contend that the evidence presented by the Milanos was insufficient to allow a jury to find either (1) that they breached the accepted standard of medical care by failing to refer Michael to a pediatric neurologist, or (2) that any such a failure to refer, even if a departure from accepted practice, constituted a proximate cause of any of Michael's injuries. With respect to Drs. Freed, Kleinberg, and Rosenthal, however, a review of the trial testimony belies both of these contentions.

As to breach of the standard of care, the evidence developed at trial could readily support a jury finding that, given the nature of Michael's symptoms, Drs. Freed, Kleinberg, and Rosenthal deviated from accepted medical practice by failing to recognize the need to refer Michael to a pediatric neurologist. Jeanne and Christopher, as well as Jeanne's parents, testified at length about the unusual symptoms that Michael manifested beginning in mid-March 1988. They also stated that they repeatedly reported these symptoms in detail to the defendant doctors: to Dr. Kleinberg during his examination of Michael on both March 30 and May 19; to Dr. Freed at Michael's visit on April 19; and to Dr. Rosenthal during Michael's appointment of May 31. And both Dr. Kaufman and Dr. Pavlakis expressly testified with respect to each of

these encounters that, according to accepted medical practice, an infant with these symptoms should have been referred to a pediatric neurologist. The testimony of these doctors thus served to establish the appropriate standard of care and provided an adequate basis for a jury to find that Drs. Freed, Kleinberg, and Rosenthal breached this standard. *See Lipsius v. White,* 91 A.D.2d 271, 277–78, 458 N.Y.S.2d 928, 933 (2d Dep't 1983).

Doctors Freed, Kleinberg, and Rosenthal argue that because Michael did not manifest these symptoms during office visits, they did not record them. And, they contend that, without these "objective findings," they had no duty to refer Michael to a pediatric neurologist. Even assuming that the symptoms were not apparent during the office visits (which is by no means certain), the defendants cannot escape liability on these grounds. The issue is not whether Michael manifested symptoms during the visits, but rather whether, on these facts, the doctors should have believed the family's reports that Michael actually had those symptoms and investigated further. Given the testimony about the symptoms, corroborated by the family videotape, a jury could reasonably find that Michael did in fact suffer from them. Thus, the jury could also reasonably find that the doctors should have believed the family's reports and followed up on them, rather than dismiss them as the over-reaction of a "nervous, first-time mother." *See Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944) (" 'The jury were the judges of the credibility of the witnesses ... and in weighing their testimony had the right to determine how much dependence was to be placed upon it.' " (quoting *Aetna Life Insurance Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 724, 35 L.Ed. 371 (1891))); *cf. United States v. Scop,* 846 F.2d 135, 142 (2d Cir.) ("[t]he credibility of witnesses is exclusively for the determination

by the jury"), *modified on other grounds,* 856 F.2d 5 (2d Cir.1988).[3]

Turning to the issue of causation, the defendants stress that it was undisputed that Michael's tumor was discovered fortuitously, since Dr. Pavlakis acknowledged that he ordered a chest x-ray because of Michael's persistent fever. Stressing that neuroblastomas are both very rare and difficult to detect, the doctors claim that the trial evidence presented no basis for concluding that Michael's tumor would have been diagnosed earlier had he been promptly referred to a pediatric neurologist.

But the doctors' contentions are again contradicted by the testimony of experts at trial. Both Dr. Pavlakis and Dr. Kaufman stated that a timely referral to a pediatric neurologist would likely have led to an earlier diagnosis of Michael's neuroblastoma. Though Dr. Pavlakis indicated that he would not have immediately ordered a chest x-ray had it not been for Michael's fever, both he and Dr. Kaufman indicated that, if Michael was exhibiting the strange set of symptoms described by the Milanos, a pediatric neurologist would have proceeded to conduct a series of tests that, within a short period of time, would have led to the diagnosis of Michael's tumor.[4]

Completing the chain of causation, Dr. Pavlakis testified that had Michael's tumor been diagnosed earlier "there would [have been] a good chance that he ... would be somewhat better than he is now." And Dr. Kaufman explained that earlier diagnosis and treatment would have made a "big difference" in Michael's condition. *See Hughes v. New York Hospital–Cornell Medical Center,* 195 A.D.2d 442, 443–44, 600 N.Y.S.2d 145, 147–48 (2d Dep't 1993) (reversing the dismissal of a medical malpractice action based on the doctor's failure to refer the patient to

---

**3.** In reaching this conclusion, we need not, and do not, by any means suggest that a pediatrician must always refer to a specialist any child whose parents make complaints about symptoms that seem not to manifest themselves during office visits.

**4.** For example, Dr. Kaufman indicated that were he treating Michael, upon observing the infant's breathing and leg problems, he "would have ...

[ordered] a plain x-ray of the abdomen and the chest to see what that showed." Similarly, Dr. Pavlakis suggested that a pediatric neurologist presented with Michael's "very unusual compilation" of symptoms would have before long ordered an x-ray, because "if one did not [at first] find [the answers] one would have expected[,] one would have started to look elsewhere."

a specialist because the evidence would not permit a court to conclude, as a matter of law, that a prompt referral "would have had no effect").

This testimony is more than sufficient to raise a jury question on causation with respect to Drs. Freed and Kleinberg. The issue is somewhat closer with respect to Dr. Rosenthal, who examined Michael only a month before Dr. Carmel, the neurosurgeon who recommended an immediate examination by a pediatric neurologist. But based on the trial evidence, a jury could properly find that, had Dr. Rosenthal done what Dr. Carmel did, Michael's condition would have been discovered several weeks earlier than it was. And, in view of Drs. Kaufman's and Pavlakis's testimony on the significance of earlier diagnosis and treatment, a jury could in turn find that even a delay this short aggravated Michael's injuries.[5]

■ Our determination that the Milanos presented sufficient evidence to allow some of their malpractice claims to get to a jury does not, however, extend to Dr. Silvergleid. There is no contention, let alone any evidence, that Dr. Silvergleid, the radiologist who was only asked to conduct a CAT scan and 3–D reconstruction, should have recognized Michael's symptoms and himself have referred Michael to a pediatric neurologist. Rather, the Milanos assert that Dr. Silvergleid committed malpractice by mis-reading Michael's tests as supporting a diagnosis of craniosynostosis.

The Milanos did not, however, present any competent evidence as to the standard of care for a radiologist in this context and so failed to establish that Dr. Silvergleid deviated from accepted medical practice in conducting and interpreting Michael's CAT scan and 3–D reconstruction. Dr. Kaufman and Dr. Pavlakis did question Dr. Silvergleid's reading of these tests and his conclusion that Michael suffered from craniosynostosis. But they conceded that, as pediatric neurologists, they were not fully knowledgeable about the practice of radiology. It follows that neither was competent to assert that Dr. Silvergleid had departed from accepted radiological practice,[6] and, therefore, that the action against Dr. Silvergleid was properly dismissed. *See Donohoe v. Goldner,* 168 A.D.2d 412, 414, 562 N.Y.S.2d 538, 540 (2d Dep't 1990) (holding that action against radiologist should have been dismissed because "the plaintiff failed to produce an expert qualified to attest to what good and accepted radiological practice was at the time").

## II. Partnership by Estoppel

The Milanos' complaint named Dr. Citerman as a defendant, not because of any alleged malpractice on her part, but as a vicariously-liable partner in the Freed Group. The District Court ruled, however, that Dr. Citerman was not in fact a partner in the Freed Group, and on that ground dismissed the action against her.

■ On appeal, the Milanos seem to concede that Dr. Citerman was not an actual

5. The defendants cannot be heard to complain that the Milanos failed to prove the precise degree of damages suffered by Michael as a result of their malpractice. Whatever may be the case when the amount of damages is in issue, at this, the liability stage of the proceeding, a jury question was raised simply by the evidence that the "failure to refer" was a proximate cause of some part of Michael's ultimate injuries. *Cf., e.g., Sachs v. Nassau County,* 151 A.D.2d 558, 559, 542 N.Y.S.2d 337, 338–39 (2d Dep't 1989) (upholding a jury award in a malpractice action, over claims that the evidence of proximate cause was lacking, because the trial testimony allowed the jury to find that the defendants' failure to act caused "additional pain and suffering").

6. The Milanos claim that the District Court improperly prohibited their witnesses from testify-

ing fully concerning Dr. Silvergleid. A review of the trial record reveals, however, that neither Dr. Kaufman nor Dr. Pavlakis was impeded from discussing those aspects of Dr. Silvergleid's conduct about which they were competent to testify. The only apparent limitation on their testimony concerned matters bearing on the practice of radiology. But since both doctors indicated that they were not able to evaluate the standards of care expected of radiologists, we find no basis for faulting the District Court for the restrictions it placed on their testimony. *See In re Air Disaster at Lockerbie Scotland on December 21, 1988,* 37 F.3d 804, 824–25 (2d Cir.1994) (discussing a trial court's discretion to control the testimony of experts), *cert. denied,* —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995).

partner in the Freed Group; they seek instead to hold her liable under the New York doctrine of "partnership by estoppel." *See* N.Y. Partnership Law § 27. Section 27 of New York's Partnership Law states that when "a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership . . ., he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership." The Milanos contend that they presented sufficient evidence to raise a jury question on whether Dr. Citerman was liable as a partner by estoppel. We disagree.

There is some evidence—most notably a bill from the Freed Group with Dr. Citerman's name prominently displayed—which might allow a jury to conclude that Dr. Citerman represented herself, or consented to another representing her, as a partner in the Freed Group. But we find nothing in the record to indicate that the Milanos, "on the faith of such representation, [gave] credit to the actual or apparent partnership." *Id.* There is, for example, no testimony or any other evidence suggesting that the Milanos relied upon representations that Dr. Citerman was a partner in the Freed Group when they decided to use the partnership as Michael's pediatricians. Since in New York some such evidence is essential to establish liability through partnership by estoppel, *see Hartford Accident & Indemnity Co. v. Oles,* 152 Misc. 876, 878, 274 N.Y.S. 349, 353 (N.Y.Sup.1934) (explaining that, in addition to a representation that a partnership existed, there must also be evidence that the representation "influence[d] the other party to act"), and since the Milanos' presented no such evidence, we agree with the District Court's conclusion that the action against Dr. Citerman must be dismissed.

7. This holding renders moot the Milanos' complaints about the District Court's decision to order a bifurcated trial on the issues of liability and damages. Our partial reversal changes the cast of characters in this action, and it is up to the District Court, exercising sound discretion, to decide anew whether the trial of the Milanos' action should be unitary or bifurcated. *See* Fed.

## CONCLUSION

The evidence presented at trial created jury questions under New York law as to whether Drs. Freed, Kleinberg, and Rosenthal breached accepted standards of medical care by failing to refer Michael to a pediatric neurologist and as to whether such a breach proximately caused some of the injuries that Michael suffered. The Milanos' evidence, however, was inadequate as a matter of law to sustain their medical malpractice action against Dr. Silvergleid or to maintain their action against Dr. Citerman as a purported partner in the Freed Group. Accordingly, the part of the judgment dismissing the Milanos' action against Dr. Citerman, Dr. Silvergleid, and Manhasset Diagnostic Imaging, P.C., is affirmed, while the portion dismissing the Milanos' action against the remaining defendants is reversed and remanded for further proceedings.[7]

R.Civ.P. 42(b); *see also Getty Petroleum Corp. v. Island Transportation Corp.,* 862 F.2d 10, 15 (2d Cir.1988) ("[W]hether to bifurcate a trial into liability and damages phases is a matter within the sound discretion of the trial court."), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989).